

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-10-1999

# Jones v. School Dist. Phila.

Precedential or Non-Precedential:

Docket 98-2154

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Jones v. School Dist. Phila." (1999). *1999 Decisions.* Paper 320.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/320

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 10, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-2154

CHARLES S. JONES,

      Appellant

v.

SCHOOL DISTRICT OF PHILADELPHIA

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 97-2653)
District Judge: Honorable J. Curtis Joyner

Argued November 4, 1999

BEFORE: BECKER, Chief Judge, and GREENBERG
and CUDAHY,* Circuit Judges

(Filed: December 10, 1999)

        Reginald C. Allen (argued)
        Rosemarie Rhodes
        Harper & Paul
        140 W. Maplewood Avenue
        Philadelphia, PA 19144

         Attorneys for Appellant

_____
* Honorable Richard D. Cudahy, Senior Judge of the United States Court
of Appeals for the Seventh Circuit, sitting by designation.

Andrew M. Rosen (argued)
School District of Philadelphia
Office of General Counsel
2130 Arch Street, 5th Floor
Philadelphia, PA 19103

Attorney for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

This matter is before this court on an appeal from an order for summary judgment entered in favor of the employer in this employment discrimination action. The appellant Charles Jones instituted this case against his former employer, the School District of Philadelphia, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. SS 2000e et seq., the Pennsylvania Human Relations Act ("PHRA"), Pa. Stat. Ann. tit. 43, SS 951 et seq., (West 1991), and 42 U.S.C. S 1981. The school district employed Jones as a teacher from 1985 to 1995, certified to teach physics, chemistry, biology and other subjects. Jones resigned from the school district effective June 30, 1995. According to Jones, he resigned because school district personnel informed him that he would be terminated involuntarily unless he did so. Jones, an African-American, then filed this lawsuit, alleging race discrimination and retaliation by the school district. We set forth the background of the matter at some length as the case is intensely fact driven.

Jones's first assignment in the school district was in the science department at Northeast High School ("NEHS") where he taught physical science, chemistry, and physics. Jones remained at NEHS until March 1993, when the school district transferred him to George Washington High School ("GWHS"). In addition to his teaching responsibilities at NEHS, Jones served as the boys' varsity soccer coach from 1985 to the time of his transfer. Jones applied for the

2

position of girls' soccer coach in January 1993, but NEHS chose another teacher for that position.

As early as the first year of Jones's assignment to NEHS, Principal Francis Hoban began to receive complaints from Jones's students that he was "hostile" in class. Hoban testified at his deposition that several students objected to the way that Jones "talked down" to his students. In addition, students and parents complained to Hoban that Jones's grading policy was too strict, leading Hoban to indicate to Jones that his grading policy was "unrealistic," and resulted in disproportionately large numbers of failures.

Hoban disciplined Jones several times during his employment at NEHS because of student and parent complaints and other incidents. At his deposition, Hoban characterized "formal disciplinary action" against a teacher as taking essentially one of two forms: (1) a memorandum directed from school administration to the teacher setting forth the nature of the teacher's unsatisfactory conduct, or (2) an "SEH-204," which is an "anecdotal record" and is viewed as a more severe form of reprimand. A teacher could receive an SEH-204 reprimand for an unsatisfactory classroom evaluation or for other conduct that an administrator considered unacceptable. Jones believes that for the most part the disciplinary actions taken against him were improper or unwarranted, and that his comments often were misunderstood. Moreover, he asserts that Hoban repeatedly targeted him for harassment because of his race.

The school district's disciplinary actions against Jones included several memoranda on a variety of issues, at least two SEH-204s based upon unsatisfactory classroom evaluations, and several SEH-204s pertaining to other unsatisfactory conduct. For example, Hoban issued several memoranda to Jones regarding problems students, parents and staff encountered in connection with Jones's responsibilities as the varsity soccer team coach. In addition, Hoban issued memoranda to Jones concerning his teaching style and complaints from students and parents on this point. Jones also received memoranda from administrators regarding his failure to meet with parents of students in his class upon request and his failure to attend

3

a parents' conference on November 17, 1992. Finally, Jones received a memorandum from NEHS Assistant Principal Lowman in January 1993 regarding an incident between Jones and NEHS guidance counselor Nick Tancredi in which Tancredi alleged that Jones became abusive.

Jones also received a number of SEH-204s during his employment at NEHS. The first appears to have been sent in 1991, and concerned several complaints of parents and teachers regarding his grading policy and allegedly hostile attitude towards his students. Jones was issued another SEH-204 in January 1992 as a result of a verbal altercation between him and Ernest Davis, a school district supervisory employee. Davis accused Jones of calling him an "ass" and a "horse's ass" in response to a discussion between them concerning the safety of Jones's field house locker room office.

Hoban gave Jones another SEH-204 in December 1992 that documented an unsatisfactory classroom evaluation. Hoban stated in the record of the observation that Jones had little interaction with the students and that his tone of voice was "harsh." Hoban also indicated that he observed very little instruction, and that Jones's method of lecture was inappropriate in a lab subject such as physics. Hoban instructed Jones to engage in the following actions: (1) turn lesson plans into the department head each week which detail course objectives and student lab work; (2) get students involved in the program; (3) turn in cut slips for students; (4) contact parents of students performing poorly in class; and (5) contact parents of students on the student roll but not attending class.

Jones received a second unsatisfactory classroom evaluation in February 1993, again in the form of an SEH-204. By the time of this evaluation, Hoban already had informed Jones of his intention to recommend his transfer to another school.

The final matter leading to the school district's transfer of Jones from NEHS appears to have occurred in or about January 1993. Hoban and Assistant Principal Lowman sent Jones memoranda directing him to meet with a parent of one of Jones's students. Apparently, the student was failing

4

Jones's physics class, and his mother wanted to meet with Jones to discuss the situation. When the mother arrived, Jones refused to meet with her without union representation at the meeting. Thereafter, Hoban directed Jones to meet with the student's mother but he again refused to do so. According to Jones, on the advice of his union representative he refused to meet any parent without union representation. Jones explained that he was fearful for his safety in view of prior incidents in which a parent and a student had threatened him.

As a result of Jones's conduct, Hoban issued him an SEH-204, characterizing his failure to meet with the mother as insubordinate in the circumstances. Hoban stated that the mother attempted to contact Jones on several occasions to schedule a meeting, but that Jones never responded to her requests or notes. Hoban recommended that Jones be suspended and administratively transferred from NEHS as a result of the incident. In March 1993, Frank Guido, the regional superintendent for the school district, upheld the transfer recommendation.

In fact, the school district transferred Jones to GWHS in April 1993 on "special assignment" for the remainder of the 1992-93 school year. During the summer of 1993, the administrators required Jones to list five alternatives for his placement for the 1993-94 school year. Jones chose GWHS in the hope that he could teach physics there.

Sam Karlin, the new science department head for GWHS for the 1993-94 school year, was responsible for assigning rosters to teachers in his department. Karlin assigned the physics roster for the 1993-94 school year to a white woman. On the first day of school, Jones learned that he was not assigned the physics roster, and he went to see Karlin to discuss the issue.

Jones states in his affidavit that he told Karlin that he should have received the physics roster because the teacher selected was not certified to teach the class. Jones claims that Karlin refused to change the assignment of the physics roster, and ignored what Jones told him. Thereafter, Jones brought the issue to the attention of Assistant Principal Alvin Vaughn and Principal Harry Gutelius, but both indicated that they would "stand by" Karlin's decision.

5

Sometime during the fall of the 1993-94 school year, Karlin received a telephone call from a parent of one of Jones's students alleging that Jones threatened to hit his students with a baseball bat. Specifically, the parent stated that when a student threw a piece of paper at Jones he responded in the following manner:

> If I find out who threw that paper I'll kick your ass. I'll hit you in self defense if I have to. If I have to bring in a baseball bat I will. I had a problem in another school with a girl there and there was a court case. I have the district attorney's number and I won't hesitate to use it.

Jones states in his affidavit that he remembers stating only that he would defend himself "if necessary," and then asked, "do I need to bring in a baseball to protect myself."

Karlin reported the call to Assistant Principal Vaughn, who investigated the matter by interviewing students and meeting with Jones and his union representative. As a result of the investigation, Vaughn issued Jones an SEH-204, and recommended to Gutelius that Jones be suspended for five days without pay and administratively transferred from GWHS.

In addition to the episode involving the threat, Vaughn recommended Jones's transfer based upon his continued "exercise of poor judgment, and failure to adhere to school district policies and procedures." In reaching his conclusion, Vaughn relied upon the information he gathered during his investigation, various memoranda from Karlin to Jones, as well as an SEH-204 dated January 6, 1993, from Principal Hoban. Gutelius also recommended Jones's transfer after considering Vaughn's SEH-204. The school district approved Jones's transfer to Edison High-Fareira Skills Center ("Edison") in or about the spring of 1994. Nevertheless, Jones was not transferred immediately from GWHS after the incident.

Jones was assigned to Edison, which has a reputation of being a difficult school, for the 1994-95 school year. Jones states that on the first day of classes, Vice Principal Kinder conducted a classroom observation of him. Jones's union representative testified that generally speaking, "from the

6

federation's point of view," a classroom observation on the first day of school would be unusual and inappropriate given the fact that the first day of classes is a hectic time for both teachers and students.

In or around the fall of 1994, Jones made a comment to his students during class allegedly in response to a student's conduct in defacing school desks in Jones's presence. Jones states in his affidavit that he used words to the effect that the students should not deface the school because it was built for the Puerto Rican community. Arturo Velazquez, one of Jones's students, indicated that he was offended by the remarks. Jones then asked Velazquez to remain after class so that they could speak, and at the conclusion of class, Jones escorted Velazquez into a vacant adjoining room.

The remainder of what occurred during Jones's encounter with Velazquez is in dispute. Jones claims that almost immediately Velazquez pushed him against a file cabinet and grabbed him in a headlock. Jones states that he attempted to wrestle Velazquez off his neck and torso, and that in doing so, his hand "could" have touched the student's face. In contrast, Velazquez told administrators that Jones punched him on the left eye and jaw, and threw him on the floor. Velazquez stated that he did not initiate any physical contact with Jones.

Principal Raul Torres investigated the incident by interviewing Jones, Velazquez, and other students in the class at the time of Jones's comments about the Puerto Rican community. As a result of the investigation, Torres determined that Jones punched Velazquez without provocation and made inaccurate and racist comments which precipitated the event. Torres issued Jones an SEH–204 which recommended his dismissal based upon the assault, his prior record of using profanity in addressing students in the classroom, and his prior use of implied threats to harm students. Jones, however, resigned from the school district as of June 30, 1995, and thus the school district did not directly discharge him.

II. PROCEDURAL HISTORY

After filing administrative complaints with the Pennsylvania Human Relations Commission and the Equal

Employment Opportunity Commission in 1993 and 1994 respectively, Jones received a right to sue letter from the EEOC dated January 14, 1997. He then filed his complaint in the district court on April 17, 1997.

In his complaint, Jones alleged the following claims: (1) a disparate treatment race discrimination claim under Title VII and the PHRA based upon his administrative transfer from NEHS to GWHS; (2) a disparate treatment race discrimination claim under Title VII and the PHRA based upon the decisions to deny him the physics roster and transfer him to Edison; (3) a disparate treatment race discrimination claim under 42 U.S.C. S 1981 based on his forced resignation; and (4) retaliation claims under Title VII, the PHRA, and section 1981 based upon each of those events. His complaint also mentions the fact that he was denied the position of girls' soccer coach shortly before his transfer in April 1993 to GWHS. Nevertheless, it appears from his brief that he does not challenge that decision as constituting an adverse employment action in and of itself; instead, he apparently cites this action as evidence that Hoban treated him differently because of his race.

The school district filed a motion for summary judgment that the district court granted by memorandum and order. See Jones v. School Dist. of Philadelphia, 19 F. Supp.2d 414 (E.D. Pa. 1998). Jones filed a motion for reconsideration, which the district court denied by order entered November 10, 1998. Jones then filed this timely appeal. While the notice of appeal recites that it is from the order of November 10, 1998, effectively the appeal is from the summary judgment as well and we are deciding the case on that basis. See Williams v. Guzzardi, 875 F.2d 46, 49 (3d Cir. 1989).

III. DISCUSSION

On this appeal, we review the district court's grant of summary judgment de novo. See Nelson v. Upsala College, 51 F.3d 383, 385 (3d Cir. 1995). Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is

8

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In deciding the motion, we view the record in the light most favorable to Jones and resolve all reasonable inferences in his favor. See Deane v. Pocono Med. Ctr., 142 F.3d 138, 142 n.3 (3d Cir. 1998) (en banc). We do not distinguish between the claims under federal and Pennsylvania law in our disposition of the case as we agree with Jones's contention that the standards are the same for purposes of determining the summary judgment motion. See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

While Jones's brief is complex, we discern that his primary contentions on appeal are: (1) the district court erroneously concluded that his only claim was a claim of constructive discharge, thereby misapplying the elements of a prima facie case under Title VII and the PHRA; (2) the district court erred in resolving factual issues in the school district's favor in violation of the standard applied at summary judgment proceedings; (3) the district court improperly discounted Jones's direct evidence of Hoban's discriminatory animus, as well as evidence that showed that he systematically mistreated Jones during his employment at NEHS; (4) the district court ignored the inference of discrimination which arises from Jones's evidence that similarly situated white teachers were treated more favorably than Jones; (5) the district court erroneously applied the test for determining whether Jones was constructively discharged; (6) the district court improperly dismissed Jones's retaliation claim because it found that the relevant decisionmakers had no knowledge of his prior EEO activity and determined that there was insufficient evidence of retaliatory motive to survive a motion for summary judgment. Jones asks us to reverse the district court's disposition of the matter and remand the case for trial.

A. Disparate treatment claims under Title VII, section 1981, and the PHRA

The parties do not dispute that Jones's disparate treatment race discrimination claims under Title VII, section 1981, and the PHRA require application of the familiar burden-shifting framework the Supreme Court articulated in McDonnell Douglas Corp. v. Green , 411 U.S.

9

792, 802, 93 S.Ct. 1817, 1824 (1973). While Jones's brief refers to what he considers to be "direct evidence" of Hoban's discriminatory intent, it does not appear that he is attempting to proceed under a mixed motive theory and, in any event, such an analysis would not be appropriate in this case. Briefly summarized, the McDonnell Douglas analysis proceeds in three stages. First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id. Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093 (1981) (citations omitted). While the burden of production may shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. Our experience is that most cases turn on the third stage, i.e., can the plaintiff establish pretext.

The parties raise several issues pertaining to the proper analysis of Jones's prima facie case of discrimination, as well as the sufficiency of his evidence of pretext. The district court dismissed Jones's disparate treatment claims on two separate bases: (1) he failed to satisfy the third element of his prima facie case; and (2) there was insufficient evidence calling into question the legitimacy of the school district's proffered reasons for its adverse employment decisions.

1. Prima facie case analysis

Citing our decisions in Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996) (en banc), and Waldron v. S.L. Industries, Inc., 56 F.3d 491 (3d Cir. 1995), the district court stated that a prima facie case is established when a plaintiff shows the following: (1) "that he is a member of a protected class"; (2) that he "is qualified for the position"; (3) that he "was either not hired

10

or fired from that position"; (4) "under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class." Jones, 19 F. Supp.2d at 418 (emphasis added). The district court stated that elements one, two and four arguably were satisfied, but that element three was not because the record reflected that Jones resigned and thus was not fired. Id. at 418–19. From that conclusion, the district court stated that it was required to "determine whether or not [Jones's] resignation amounted to a constructive discharge," and proceeded to an analysis of that point, holding that it did not. Id. at 419–20 (internal quotation marks omitted).

The court then went on to hold that "even assuming arguendo, that [Jones] has made out a prima facie case, he has produced no evidence to rebut or show that the reasons articulated by the School District for his termination are a pretext for discrimination." Id. at 420. Consequently, the court determined that on this ground as well as Jones's failure to make a prima facie case, the school district was entitled to summary judgment.

Jones asserts that the district court's analysis oversimplified the matter, as the court did not recognize that his complaint asserted claims against the school district based on adverse employment decisions during his employment rather than merely on his termination. Jones contends that these claims are distinct from his claim of constructive discharge in 1995.

We agree with Jones's position on this point, as the complaint clearly delineated the factual basis for his Title VII and PHRA claims, and a review of that pleading confirms that he did not predicate his claims solely on the alleged constructive discharge. Indeed, Jones pleaded the constructive discharge claim only under 42 U.S.C.S 1981. In fact, Jones's complaint challenged not only the purported constructive discharge, but also the transfers and the denial of the assignment to him of the physics roster at GWHS.

The district court's error seems to have stemmed from its borrowing of language from cases which recited the

11

necessary elements of a prima facie case where the challenged employment decision is a termination. See Sheridan, 100 F.3d at 1066 n.5 (noting elements which are required to establish a prima facie case of "discriminatory discharge"); Waldron, 56 F.3d at 494 (same). Rather than considering the possibility that the constructive discharge claim was but one of Jones's claims arising out of his employment relationship with the school district, the court turned its attention to the constructive discharge analysis because Jones admittedly had not been terminated directly so as to satisfy the third element of a prima facie case as articulated in Sheridan and Waldron. Compare Sheridan, 100 F.3d at 1063, 1072–75 (count I of plaintiff 's complaint alleged a failure to promote claim under Title VII and count III alleged a claim of constructive discharge; court considered sufficiency of evidence presented on each claim separately).

We often have remarked that the elements of a prima facie case depend on the facts of the particular case. See, e.g., Pivirotto v. Innovative Sys. Inc., 191 F.3d 344, 352 (3d Cir. 1999); Torre v. Casio, Inc., 42 F.3d 825, 830 (3d Cir. 1994). Thus, a prima facie case cannot be established on a one–size–fits–all basis. In fact, the relevant question with respect to Jones's Title VII and PHRA claims is whether he suffered some form of "adverse employment action" sufficient to evoke the protection of Title VII and the PHRA. See Connors v. Chrysler Fin. Corp., 160 F.3d 971, 974 (3d Cir. 1998) (stating that third element of prima facie case in disparate treatment ADEA case is that plaintiff suffered an adverse employment action); Deane, 142 F.3d at 142 (same under ADA); Simpson v. Kay Jewelers, 142 F.3d 639, 644 n.5 (3d Cir. 1998) (same under ADEA); Lawrence v. National Westminster Bank, 98 F.3d 61, 66 (3d Cir. 1996) (same). Obviously, something less than a discharge could be an adverse employment action.

We have held that employment decisions such as transfers and demotions may suffice to establish the third element of a plaintiff 's prima facie case. See, e.g., Torre, 42 F.3d at 831 n.7 (recognizing that a job transfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse job action); see also

12

McGrenaghan v. St. Denis Sch., 979 F. Supp. 323, 326 (E.D. Pa. 1997) (same). Here, Jones challenges both administrative transfers and the denial of the physics roster. As a result of the first transfer, he lost his opportunity to teach physics, which clearly was the subject he sought most to teach. After Jones chose to remain at GWHS because of the possibility that he would be awarded the physics roster, he learned that he was passed over for that position. Instead, the administration assigned Jones to teach what he regarded as less desirable science classes.

Moreover, the transfer from GWHS to Edison landed Jones in a placement which had a reputation of being a "difficult school." Viewing the facts in the light most favorable to Jones, they suffice to demonstrate that Jones was subjected to sufficient adverse employment actions such that his Title VII and PHRA claims should have survived the initial stage of the McDonnell Douglas analysis. See Torre, 42 F.3d at 831 n.7 (plaintiff 's transfer to "dead-end" job was sufficient to support plaintiff 's prima facie case); see also DiIenno v. Goodwill Indus., 162 F.3d 235, 236 (3d Cir. 1998) (holding in context of retaliation claim that transfer could constitute adverse employment action as viewed from plaintiff 's perspective).

Finally, we conclude that the district court erred in granting summary judgment to the school district on Jones's constructive discharge claim under section 1981 on its theory that he failed to establish a prima facie case. In Goss v. Exxon Office Systems Co., 747 F.2d 885 (3d Cir. 1984), we recognized that an involuntary transfer to a less desirable position could support a claim of constructive discharge, especially where the surrounding circumstances indicate a pattern of discriminatory treatment. Id. at 888-89. Thus, we affirmed the trial court's findings that the plaintiff had been constructively discharged where she presented evidence that she was involuntarily transferred after her supervisor questioned her ability to combine a career with motherhood. At the prima facie case stage of the analysis, we merely determine whether a plaintiff has presented sufficient evidence so that we should consider a defendant's proffered reasons for its decision and, if the defendant has presented reasons, the plaintiff 's evidence of

13

pretext. Viewed under that lens and in the light most favorable to Jones, he should have withstood summary judgment on that aspect of his constructive discharge claim, because his involuntary transfer to two schools and the second school's failure to assign him the physics roster despite his qualifications, was sufficient to establish a prima facie case under section 1981.

2. Pretext analysis

We turn now to the second and third steps of the McDonnell Douglas tripartite framework. The second stage requires the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action at issue. Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). Jones does not appear to contest that the school district satisfied its burden of production in this regard and plainly it did.

Once the defendant has satisfied its burden of production at the second stage of the McDonnell Douglas tripartite framework, a court's analysis turns to the third andfinal aspect of the inquiry which, as we have indicated, is usually the determinative stage of the case. At this point, the court focuses on whether there is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional race discrimination. At trial, the plaintiff must convince the finder of fact "both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752 (1993) (emphasis in original). The factfinder's rejection of the employer's proffered reason allows, but does not compel, judgment for the plaintiff. Sheridan, 100 F.3d at 1066–67.

On numerous occasions, we have explained the plaintiff 's burden at summary judgment on this aspect of the McDonnell Douglas tripartite framework. Specifically, in Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994), and later in Sheridan, we stated that a plaintiff may defeat a motion for summary judgment (or judgment as a matter of law) by pointing "to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve

14

the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764; Sheridan, 100 F.3d at 1067.

We recently characterized this final aspect of the McDonnell Douglas analysis as comprised of two alternatives as articulated by Fuentes and Sheridan . See Keller, 130 F.3d at 1108. In Keller, we explained that to satisfy the first prong of the Fuentes/Sheridan standard,

> the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

Id. at 1108-09. Then we indicated that a plaintiff may satisfy this standard by demonstrating, through admissible evidence, that the employer's articulated reason was not merely wrong, but that it was "so plainly wrong that it cannot have been the employer's real reason." Id. at 1109.

Under the Fuentes/Sheridan inquiry, the plaintiff also may survive summary judgment by pointing to evidence in the record which "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 764. In Simpson, we provided the following explanation of this prong: "For example, the plaintiff may show that the employer has previously discriminated against [the plaintiff], that the employer has previously discriminated against other persons within the plaintiff 's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." Simpson, 142 F.3d at 645 (citing Fuentes, 32 F.3d at 765).

15

The district court in its determination that even if Jones had established a prima facie case of discrimination in his termination, stated that he "produced no evidence aside from his own testimony that the actions directed against him by the school district were racially motivated." Jones, 19 F. Supp.2d at 420. Jones challenges that ruling, arguing that the court erred in dismissing his disparate treatment claims by ignoring circumstantial evidence favorable to this claim and failing to recognize that he raised many factual issues that would allow a jury to find that the school district's proffered reasons for transferring plaintiff twice and denying him the physics roster were unworthy of credence.

Jones's brief focuses principally upon his employment at NEHS and his transfer from that school. Nevertheless, he also addresses the other adverse employment actions he has suffered, claiming that each constitutes a violation of Title VII and the PHRA. Consequently, we have made a complete study of the record of this case to determine whether there is sufficient evidence from which a jury could conclude that the school district's purported reasons for its adverse employment actions were a pretext for discrimination. While we do not set forth all of the evidence and explain our analysis of it, we have concluded that there is insufficient evidence to support the claim of pretext. In this regard, we point out that Jones makes numerous allegations in his affidavit which he predicates on nothing more than his beliefs without having actual knowledge of them. In fact, a careful analysis of the record demonstrates that many of his allegations simply are not supported. Moreover, Jones minimizes the baseball bat matter as merely "a minor classroom incident." Br. at 3. We think it clear that a school district hardly can tolerate comments from a teacher even to disruptive students that he will use a baseball bat on them.

Overall, the circumstances of this case which we already have described in detail reflect a situation in which the employer should have been able to take adverse employment actions against the employee without fear of being embroiled in an expensive law suit. While Jones may quarrel with the school district's conclusions regarding

16

particular controversies, the bona fides of its determinations simply cannot be doubted. Thus, though we view Jones's claims as broader than the district court recognized, we are in complete agreement with its conclusion that he presented no evidence from which a jury could conclude that the school district's articulated reasons for its adverse employment actions were a pretext for discrimination. See Jones, 19 F. Supp.2d at 420. Consequently, we will affirm the summary judgment against Jones on his disparate treatment race discrimination claims under Title VII and the PHRA.

As we have indicated, in addition to bringing Title VII and PHRA race discrimination claims, Jones has brought a claim under 42 U.S.C. S 1981 premised upon his eventual decision to resign from his employment with the school district. In particular, his complaint states that his "involuntary resignation" was the result of the discriminatory and retaliatory treatment he experienced at Edison, including being threatened with removal for allegedly striking a student while another employee in a similar incident was not disciplined in any manner. Jones alleges that the ultimatum amounted to a constructive discharge, and further that the evidence shows that the proffered reasons for the ultimatum are unworthy of credence.

The school district's proffered legitimate nondiscriminatory reason for giving Jones the ultimatum of resigning or facing termination was primarily that Jones was involved in a physical altercation with one of his students in which he struck and injured the student without provocation. Edison principal Raul Torres stated that he also recommended Jones's discharge based upon his "prior record of using profanity in addressing students in the classroom as well has having made implied threats to use physical harm to students at GWHS."

The school district first maintains that the district court properly dismissed the section 1981 claim because the Supreme Court in Jett v. Dallas Independent School District, 491 U.S. 701, 735, 109 S.Ct. 2702, 2723 (1989), held that the exclusive federal damages remedy against a state actor for violation of that section is under 42 U.S.C.S 1983. The

school district contends that because Jones brought his constructive discharge claim under the wrong statute, the district court properly dismissed his claim. This argument implicates an issue regarding the amendment of section 1981 by the Civil Rights Act of 1991, Pub. L. No. 102-166, S 101(c), 105 Stat. 1071, 1072 (1991), i.e., did the 1991 act overturn the Jett ruling that the exclusive federal damages remedy against a state actor for a section 1981 violation is under section 1983. See Federation of African Am. Contractors v. City of Oakland, 96 F.3d 1204 (9th Cir. 1996); see also Hopp v. City of Pittsburgh, 194 F.3d 434, 1999 WL 825457, at *4 (3d Cir. Oct. 14, 1999); see, however, Dennis v. County of Fairfax, 55 F.3d 151, 156 n.1 (4th Cir. 1995).

The school district next argues that assuming arguendo that we would overlook Jones's failure to present the section 1981 claim under section 1983, dismissal was appropriate nonetheless because the standards governing Jones's Title VII and PHRA claims control his constructive discharge claim, and there is insufficient evidence demonstrating that its proffered reasons for demanding his resignation were a pretext for illegal race discrimination. Finally, the school district claims that to the extent that Jones predicates his section 1981 claim upon a theory of racial harassment, his proofs fail to satisfy thefive-part test set for in our opinion in Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990).

We find it unnecessary to consider the Jett issue as we are satisfied that a review of the evidence proffered in connection with Jones's section 1981 claim demonstrates that it is insufficient to establish by a preponderance of the evidence that the decision to request plaintiff 's resignation was motivated by racial bias. Therefore, we will affirm the district court's order for summary judgment on this claim as well.

B. The retaliation claims under Title VII, section 1981, and the PHRA

Finally, we address Jones's retaliation claims. The district court granted the school district summary judgment on these retaliation claims, finding that there "was absolutely

18

no evidence on the record before us that the [school district's] actions against [Jones] were in retaliation for his filing of EEO complaints." Jones, 19 F. Supp.2d at 421. The district court also concluded that with respect to Jones's allegations of retaliation by Principal Hoban, "the record reflects that [Jones] made no EEO filings until after Hoban recommended, and the school district upheld, his recommendation for Jones's administrative transfer." Id. (emphasis added). Finally, the district court found that Jones "produce[d] no evidence which could in any way be construed as showing any knowledge on the part of either Principal Gutelius or Principal Torres of [Jones's] previous EEO filings." Id. On this appeal, Jones apparently is attempting to expand his claims by arguing that the retaliation was in part for his opposing racial discrimination. The school district contends that this expansion is improper.

After a careful review, we are satisfied that the district court reached the correct result on the retaliation claims. While it is true that the school district took a series of adverse employment actions against Jones, it is clear that it took the actions in response to Jones's ongoing unacceptable conduct rather than because he filed complaints under Title VII or the PHRA or opposed racial discrimination. Consequently, we will affirm on this point without further discussion.

IV. CONCLUSION

For the foregoing reasons, the order for summary judgment entered October 9, 1998, and the order denying reconsideration entered November 10, 1998, will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

19