Max GAZAROV, by his parents, Karen and Tat'yana GAZAROV; Karen Gazarov; Tat'yana Gazarov, Appellants,

v.

The DIOCESE OF ERIE; St. John the Baptist School.

No. 02–3680.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Sept. 3, 2003.

Decided Oct. 21, 2003.

Pamela E. Berger, Pittsburgh, PA, for Appellants.

Kenneth W. Wargo, Quinn, Buseck, Leemhuis, Toohey & Kroto, Erie, PA, for Appellees.

Before SLOVITER, NYGAARD, and ROTH, Circuit Judges.

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

Appellants Karen and Tat'yana Gazarov, for themselves and on behalf of their son, Max Gazarov (collectively "the Gazarovs"), appeal the District Court's order of summary judgment in favor of Appellees the Diocese of Erie and St. John the Baptist School ("St. Johns"). In granting summary judgment, the District Court held that the Gazarovs presented insufficient evidence to show national origin discrimination under Title VI of the Civil Rights Act of 1964 ("Title VI"). Additionally, the District Court found there was no contractual requirement that the school develop an improvement plan for Max before suspending him. We will affirm.

### I. FACTS AND PROCEDURAL HISTORY

Because the facts are known to the parties, we review them only briefly. Max Gazarov is a student who resides with his family in Erie, Pennsylvania. The Gazarovs are refugees from Azerbaijan, a nation that was formerly part of the Soviet Union.

Through the fifth grade, Max attended Erie Public Schools. In the fall of 2000, the Gazarovs enrolled Max in the sixth grade at St. Johns, a Catholic school affiliated with the Diocese of Erie. As part of the enrollment process, the Gazarovs signed an enrollment form that made continued enrollment contingent on Max's academic performance and behavior. The form also provided that if Max's behavior became an issue, the school would contact the parents to discuss an improvement plan.

Once the school year began, Max was involved in several incidents that resulted in his being called to the principal's office and/or disciplined.[1] In October of 2000, Max was accused of writing and reading threatening letters to a female student, Marissa Donahue. When St. Johns principal Jerry Kruszewski was unable to determine who had written the letters, the matter was referred to the Erie police, who also were unable to identify the author.

On November 17, 2000, Max was involved in a fight with three male classmates, including Tim Earll. Max suffered several injuries, including a cut on his back that required medical attention. When the Gazarovs complained about Max's injuries, principal Kruszewski conducted an investigation and concluded that while it was unclear who had initiated the fight, there was no question the other boys had acted improperly. Tim was suspended from St. Johns for a day, and the other boys were removed from the school safety patrol. As a result of criminal charges against Tim, he was put on probation for three months, forced to pay restitution, and ordered to apologize to Max. The school did not punish Max for the fight.

In December of 2000, the father of one of Max's classmates contacted Monsignor Thomas McSweeney of the Diocese of Erie to complain that Max had been uttering insults and racial slurs against his child.

---

1. We note that only part of Max's disciplinary history is supported by written documentation of particular incidents. This paper trial is supplemented with descriptions of other incidents as recalled by St. Johns teachers and principal Jerry Kruszewski. The Gazarovs point to the lack of a complete paper trail as an indication that Max was not a disciplinary problem. *See* Brief for Appellant, unpaginat-

ed (noting that Max's school file had only two "minor offenses" of talking in class). We disagree with this interpretation of the documents. Under the school's disciplinary policy, a written warning would be issued only if the student chose to continue misbehavior after being asked to stop and being moved away from other students in the classroom.

In response to the allegation, the Gazarovs met with McSweeney. During this meeting, Mr. Gazarov allegedly made racially derogatory comments, which McSweeney says helped convince him that this latest allegation about Max's inappropriate comments to classmates was true. Thereafter, the Gazarovs were notified that Max had been suspended from St. Johns for three days. During that period, McSweeney and principal Kruszweski attempted to initiate a meeting with the Gazarovs to determine if something could be worked out so Max could continue at St. Johns. Mr. Gazarov refused to attend such a meeting, and thereafter Max was enrolled in another school.[2]

The Gazarovs' initial complaint against the Diocese of Erie and St. Johns claimed national origin discrimination under Title VI, negligence, breach of contract, and intentional infliction of emotional distress. After discovery, the Diocese of Erie and St. Johns filed a motion for summary judgment. The Gazarovs voluntarily withdrew their negligence and intentional infliction of emotional distress claims, so the District Court considered the motion for summary judgment on the Title VI and contractual claims only.

On August 29, 2002, the District Court granted summary judgment on behalf of the Diocese of Erie and St. Johns. The Gazarovs appeal and this court has jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

### A. Standard of Review

This court has plenary review of the District Court's decision to grant summary

judgment. *See Blair v. Scott Specialty Gases*, 283 F.3d 595, 602–03 (3d Cir.2002). We apply the same standard as used by the District Court. *Id.* A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

### B. Discrimination Claim

The Gazarovs claim that the Diocese of Erie and St. Johns acted in a discriminatory manner when they suspended Max for three days. The District Court found that the Gazarovs failed to make out a prima facie case of national origin discrimination under Title VI. Alternatively, the District Court stated that summary judgment was appropriate because the Gazarovs were unable to show that St. Johns' proffered reason for suspending Max was a pretext for discrimination.

Title VI prohibits federally funded programs, including schools, from discriminating on the basis of national origin or other characteristics. 42 U.S.C. § 2000d. It is uncontested that the Diocese of Erie and St. Johns receive federal financial assistance and are subject to Title VI's prohibition of discrimination.

The parties agree the question of whether the Gazarovs succeed on their Title VI discrimination claim is informed by the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See NAACP v. Med. Ctr., Inc.*, 657 F.2d 1322,

---

**2.** There is a dispute over whether the Gazarovs voluntarily withdrew Max from St. Johns, or whether he was expelled. It is unnecessary for us to consider this question of fact, however, since it is irrelevant to our determination of the Gazarovs' discrimination and contractual claims. We consider whether Max's three-day suspension constituted discriminatory treatment or a breach of contract.

1333 (3d Cir.1981) (en banc) (applying *McDonnell Douglas* to a Title VI claim). In *McDonnell Douglas*, the Court established a burden-shifting framework for analyzing claims under Title VII of the Civil Rights Act. 411 U.S. at 802. This framework requires the plaintiff to first establish a prima facie case of discrimination. Then, if the plaintiff is successful in doing so, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason." *Id.* "finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Jones v. Sch. Dist.*, 198 F.3d 403, 410 (3d Cir.1999) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The *McDonnell Douglas* analysis shifts only the burden of production, with the plaintiff retaining the burden of persuasion that the defendant discriminated against him. *Burdine*, 450 U.S. at 252–53.

In this case, we assume, *arguendo*, that the parties have met the burden of production for the first two steps in the *McDonnell Douglas* analysis. We do so because this court has commented that in its experience "most [discrimination] cases turn on the third stage, *i.e.* can the plaintiff establish pretext." *Jones*, 198 F.3d at 410. We proceed, as did the District Court, to the issue of whether the Gazarovs are able to show that St. Johns' proffered reason for suspending Max—their belief that current allegations against Max were true, in-

formed by Max's behavioral history—was pretext for discrimination.[3]

This Court has articulated two alternatives for the plaintiff attempting to show pretext. Either the plaintiff may show that a reasonable factfinder would: "(1) disbelieve the [defendant's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the [defendant's] action." *Jones*, 198 F.3d at 413 (citations omitted).

To make the necessary showing of pretext under the first alternative, the plaintiff can "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994) (internal citations and quotations omitted). We have no reason to disbelieve St. Johns' proffered reason for suspending Max is "unworthy of credence."

Under the second prong of the pretext analysis, the issue is whether the Gazarovs have demonstrated that St. Johns and the Diocese of Erie treated Max differently from similarly situated individuals. *See McDonnell Douglas*, 411 U.S. at 794; *Jones*, 198 F.3d at 413. To make that showing, the Gazarovs "cannot selectively choose a comparator." *See Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998). To be deemed similarly situated, the comparator must be roughly equivalent to the person in question. *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir.1996) (citations omitted).

**3.** Before reaching the pretext stage, the District Court addressed the question of whether the Gazarovs had made out a prima facie case of discrimination. In doing so, the District Court considered whether Max and other disciplined classmates were similarly situated such that the other students could be comparators in assessing St. Johns' alleged discrimination. We do not linger on that question here, because we reach it in the pretext analysis.

As the first possible comparator, the Gazarovs point to Tim Earll, who was suspended only one day for his involvement in the fight that injured Max. The Gazarovs posit that Max and Tim are similarly situated because they "were both accused of serious infractions," yet Max was suspended for three days and Tim for only one. Hence, the Gazarovs say they have shown pretext by demonstrating favorable treatment of American-born Tim.

■ Certainly there are similarities between Max and Tim: both were sixth grade students at St. Johns, both were involved in the fight on November 17, 2000, and both have been suspended. What the Gazarovs fail to appreciate is that these few similarities do not make Tim an appropriate comparator. The behaviors that led the school to suspend Max and Tim were entirely different. Max was suspended for making racially derogatory comments, while Tim was suspended for involvement in a fight. Furthermore, Tim was not similarly situated to Max because, unlike Max, Tim had no history of behavioral problems at St. Johns. The Gazarovs also imply that Tim's conduct was more serious than anything Max was accused of, since Tim was convicted of simple assault and caused physical harm to Max. This argument, too, is unavailing. The plaintiff may assert a subjective belief that another's behavior is more serious, but unless it is the *same* conduct as the plaintiff's, the supposedly more serious act by the comparator is irrelevant. *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cir.1992).

The Gazarovs also point to Marissa Donahue as an appropriate comparator. According to the Gazarovs, Marissa "lied and accused Max of writing [threatening letters]. She was enrolled at St. Johns under the same agreement as Max [yet] was never punished." The Gazarovs assert that the failure to punish Marissa helps demonstrate preferential treatment of American-born students. This assertion, however, is not enough to survive summary judgment. As with Tim Earll, the Gazarovs have not shown that Marissa was similarly situated to Max. In fact, the Gazarovs have failed to provide any evidence that Marissa lied and was therefore deserving of punishment.

Failing to demonstrate a triable issue of fact about pretext, the Gazarovs do not survive the *McDonnell Douglas* inquiry, and the District Court's grant of summary judgment was appropriate.

## C. Contractual Claim

The issue raised by the Gazarovs' contractual claim is whether the enrollment form signed by the Gazarovs, taken together with the school's disciplinary policy, required that Max be given an improvement plan before being suspended.

■ A cause of action for breach of contract under Pennsylvania law has three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract, and (3) resultant damages." *Williams v. Nationwide Mut. Ins. Co.,* 750 A.2d 881, 884 (Pa.Super.2000). The Gazarovs' breach of contract claim fails because the disciplinary policy plainly allowed for "immediate dismissal" for serious misbehavior. The school suspended Max under this provision, and therefore no duty was breached. Furthermore, as the District Court recognized, "any alleged failure of St. Johns to implement an 'improvement plan' as set forth in the enrollment form can be attributed to the Gazarovs' failure to cooperate with the school" and come to the post-suspension meeting requested by McSweeney and Kruszewski.

Because the Gazarovs have failed to make out a prima facie case for breach of

contract, the District Court's order of summary judgment was appropriate.

## III. CONCLUSION

For the reasons set forth, we will affirm the District Court's order of summary judgment in favor of the Diocese of Erie and St. Johns.