NOT PRECEDETNIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2928
_____

WILLIAM ROBINSON,
                                        Appellant

v.

NATIONAL RAILROAD PASSENGER CORP, DBA Amtrak; BROTHERHOOD OF
MAINTENANCE OF WAY EMPLOYES
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-18-cv-0341)
District Judge:  Hon. Chad F. Kenney
_____

Submitted Under Third Circuit LAR 34.1(a)
June 15, 2020

Before:   JORDAN, MATEY and ROTH, *Circuit Judges.*

(Filed: August 10, 2020)
_____

OPINION*
_____

_____

        * This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7,
does not constitute binding precedent.

JORDAN, *Circuit Judge*.

On the morning of April 3, 2016, a train crashed into a worksite near Chester, Pennsylvania, causing deaths, injuries, and property damage. The train was operated by the Appellee here, the National Railroad Passenger Corporation ("Amtrak"). The Appellant, William Robinson, was a track foreman for Amtrak and was fired following the incident. He sued Amtrak, alleging racial discrimination and intentional infliction of emotional distress.[1] The District Court granted summary judgment in favor of Amtrak. Robinson now appeals, and we will affirm.

I.      BACKGROUND

Robinson, who is African-American, was the foreman on a track maintenance project near Chester, from the evening of April 2, 2016 to the morning of April 3, 2016. During his shift, he obtained for the tracks under construction something called "foul time," a status used to prevent trains from entering a portion of track when work is being performed on it. To obtain foul time, the foreman tells Amtrak's dispatchers that work is being done on a track. The foreman is supposed to use his radio to contact the dispatcher when obtaining and releasing foul time, to ensure that other employees can hear the communication with the dispatcher. Only the foreman who obtains the foul time is

_____

[1] Robinson also alleged that he was subject to a hostile work environment. The District Court granted summary judgment against Robinson on that claim, and he has not raised any issue with respect to it on appeal, so we do not address it. *Skretvedt v. E.I. du Pont de Nemours and Co.*, 372 F.3d 193, 202 (3d Cir. 2004) ("[A]n issue is waived unless a party raises it in its opening brief[.]"). Further, in addition to Amtrak, Robinson sued the Brotherhood of Maintenance of Way Employes, his union. The Court granted summary judgment in favor of the union, and Robinson has not appealed that decision.

permitted to release it. Once released from foul time, the tracks are understood to be free for train traffic. The foreman is thus required to ensure that the track is clear before releasing foul time.

During his April 2nd to 3rd night shift, Robinson used his cellphone, rather than his radio, to obtain and release foul time. John Yager, who is white, relieved Robinson as foreman on the morning of April 3, 2016. When Robinson then called the dispatcher using his cellphone and released the foul time he had obtained, there was still work being done on one of the tracks. He told the dispatcher that Yager would call to obtain foul time for the affected tracks. Yager never contacted the dispatcher to obtain that foul time. At approximately 7:50 a.m., Amtrak Train 89 proceeded at 100 mph down the track where work was still underway. Two Amtrak employees were killed, and several other employees and passengers were injured. Assistant Division Engineer Frank Kruse, who was responsible for track maintenance, construction, and inspection in the area where the crash occurred, immediately went to the scene of the accident. He spoke with multiple employees involved in the accident and collected documentation.

After the accident, Robinson, Yager, and two other employees who had been at the site requested and were afforded medical leave. Amtrak initiated disciplinary proceedings against all four of those employees, alleging various violations of safety rules promulgated by Amtrak and other regulatory bodies. Two of the employees voluntarily resigned from Amtrak without returning from medical leave. Yager stayed on medical leave until he retired from Amtrak.

3

On April 13, 2017, Robinson voluntarily returned from medical leave and was immediately suspended with pay pending a disciplinary hearing on the alleged violations of the safety rules. Amtrak scheduled Robinson's disciplinary hearing for April 26, 2017. He was assigned a union representative. An Amtrak employee from the Office of Disciplinary Investigation was appointed as the hearing officer and had authority to decide which witnesses would be permitted at the hearing and what documents Amtrak was required to produce. The hearing officer denied Robinson's request for his private attorney to be at the disciplinary hearing. She granted his request for an Amtrak supervisor and a foreman to appear as witnesses, but both of them declined to attend. The only witness was Assistant Division Engineer Kruse. The hearing officer later issued a decision finding that Robinson had violated various safety rules. Amtrak then fired Robinson.

Both the National Transportation Safety Board ("NTSB") and the Federal Railroad Administration ("FRA") also investigated the train collision. The NTSB concluded that the accident likely would not have happened had Robinson and Yager communicated with the Amtrak dispatcher jointly. The FRA recommended that Robinson "be disqualified from performing safety-sensitive service on a permanent basis." (Supp. App. at 551.)

Robinson subsequently filed this suit against Amtrak, claiming racial discrimination in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and the Pennsylvania Human Relations Act and intentional infliction of emotional distress. The District Court granted summary judgment in favor of Amtrak. As to

4

Robinson's racial discrimination claims, the Court concluded that he had not met his burden to show that Amtrak's proffered reason for terminating his employment was pretextual. The Court also held that Robinson failed to sustain an emotional distress claim.

Robinson has timely appealed.

## II.    DISCUSSION[2]

Robinson raises two issues before us. First, he argues that there was a genuine dispute of material fact regarding whether race was a motivating factor in his termination. Second, he argues that Amtrak's actions in blaming him for the April 3, 2016 collision rise to the level of intentional infliction of emotional distress. We disagree on both counts.

### A

The District Court correctly concluded that there was no genuine dispute of material fact regarding whether race was a motivating factor for Robinson's termination and that Amtrak was entitled to summary judgment. The *McDonnell Douglas* burden-shifting framework applies to claims of racial discrimination.[3] Under that framework,

---

[2] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367, and we have jurisdiction under 28 U.S.C. § 1291. "It is well established that we employ a plenary standard in reviewing orders entered on motions for summary judgment, applying the same standard as the district court." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

[3] The well-known burden shifting framework for discrimination cases was set forth in the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Robinson's discrimination claims under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and the Pennsylvania Human Relations Act are all analyzed

"the plaintiff must first establish a prima facie case of discrimination by showing that: (1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). If the plaintiff meets that burden, the burden of production shifts to the defendant "to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the defendant meets that burden, the burden shifts back to the plaintiff "to show that the defendant's proffered reason is merely pretext for intentional discrimination." *Id.* "To discredit the employer's proffered reason, … the plaintiff cannot simply show that the employer's decision was wrong or mistaken[.]" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action" that a reasonable jury could infer that the employer did not act because of the legitimate, non-discriminatory reason. *Id.*

Here, if we were to assume that Robinson had met his burden to establish a prima facie case of discrimination, as the District Court assumed, he still has not met his burden to show that Amtrak's proffered reason for his termination – that his violation of safety protocols contributed to a fatal train accident – was pretextual. Robinson asserts that Amtrak's proffered reason can be seen as pretextual because he was scapegoated for the

_____

using the *McDonnell Douglas* burden-shifting framework. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).

6

accident. He claims that Yager, who is white, was treated more favorably than he was, and that the disciplinary proceeding was unfair and manipulated by Kruse. His protestations are unpersuasive.

First, Robinson's assertion that he was singled out for his role in the collision does not demonstrate that Amtrak's reason for firing him was a pretext for racial discrimination. It is clear from Robinson's own admissions that he violated various critical safety regulations, including by releasing foul time when he knew that the tracks were not clear and by using his cellphone rather than his radio to tell the dispatcher to release the foul time. Deaths, injuries, and significant property damage followed. Those undisputed facts are certainly sufficient for Amtrak to conclude that Robinson's employment needed to be terminated, regardless of race.

Second, there is no factual support for Robinson's claim that white employees were treated more favorably than he was. "To show that discrimination was more likely than not a cause for the employer's action, … the plaintiff may show … that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers. Div. of Sterling, Inc.*, 142 F.3d 639, 644-45 (3d Cir. 1998). Robinson argues that Yage was treated more favorably than he was, but the record shows otherwise. Both he and Yager were allowed to take medical leave following the accident and both faced disciplinary charges based on it. When Robinson returned from medical leave, any similarity between them ceased. Yager took a longer medical leave and retired upon his return, whereas Robinson tried to return to active service and was fired. Robinson cites no evidence that he was precluded from taking a

7

medical leave of similar length to Yager's, and he simply did not have sufficient years of employment at Amtrak to retire when he returned from medical leave. The undisputed facts demonstrate that Robinson was not treated unfavorably as compared to other employees.

Third and finally, there is no genuine dispute of material fact regarding Robinson's claim that a decision-maker – specifically Kruse – acted with a discriminatory motive. Robinson argues that Kruse was protecting Yager and prevented Robinson from having a fair and impartial disciplinary hearing. But Robinson fails to show that there was any connection between Kruse's actions and Robinson's race. Indeed, the minimal race-related evidence in the record does not involve Robinson or Kruse, and Robinson acknowledges that Kruse never made any racially derogatory remarks to him. Accordingly, the District Court did not err in deciding that Robinson had not shown that Amtrak's reason for terminating him was pretextual and in granting summary judgment to Amtrak on Robinson's racial discrimination claims.

**B**

The District Court also correctly concluded that Robinson did not make out a claim for intentional infliction of emotional distress. Under Pennsylvania law, "[a]n action for intentional infliction of emotional distress requires four elements: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." *Bruffett v. Warner Commc'ns, Inc.*, 692 F.2d 910, 914 (3d Cir. 1982) (internal quotation marks and citation omitted). A plaintiff must demonstrate that the defendant's conduct was "so

8

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988) (internal quotation marks and citation omitted).

Robinson claims that Amtrak tortiously caused him emotional distress by scapegoating him for the April 3, 2016 collision and by manipulating the disciplinary proceedings against him. "[I]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Id.* Here, Amtrak's conduct was not outrageous and obviously did not rise to the level of outrageousness necessary to make out a claim for intentional infliction of emotional distress. Robinson admitted to having a role – a very significant one – in a fatal accident. There is nothing outrageous in an employer's taking action to address derelictions of duty with such dire consequences.

## III. CONCLUSION

For the foregoing reasons, we will affirm the District Court's order granting summary judgment in favor of Amtrak.

9