Claudia S. SHERROD, Plaintiff,

v.

**PHILADELPHIA GAS WORKS,**
**Defendant.**

**Civil Action No. 00–4974.**

United States District Court,
E.D. Pennsylvania.

March 29, 2002.

Sharon Gilbert Timm, Rathgeber & Assoc., Doylestown, PA, for Plaintiff.

Leslie C. Safran, Ballard Spahr, Philadelphia, PA; for Defendant.

## OPINION

POLLAK, District Judge.

Plaintiff Claudia S. Sherrod has alleged discrimination on the basis of race and age by her former employer, defendant Philadelphia Gas Works ("PGW"), in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981 (" § 1981"), the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* Before the court is PGW's motion for summary judgment, brought pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons, the motion will be granted.

### Factual Background

The parties have developed a substantial record in this case. The following is a summary of the details relevant to the instant motion.

Sherrod is a black female whose date of birth is September 9, 1940. She was hired by PGW in March 1989. By 1997—the year Sherrod was promoted to a management position at PGW—she was the only black management-level employee in her department. She was also the oldest female management employee, and one of the oldest management employees overall, in her department.

### *Sherrod's Salary and Promotion History*

Sherrod was initially hired by PGW as a Junior Clerk, and in 1990 became a General Accounting Clerk, a position in which she earned approximately $18,000 per year. Before her 1997 promotion, Sherrod applied for—and was denied—at least two different positions. First, she sought a job in Human Resources. The job was given to the other applicant, Bill Ambrose, a white employee twenty years Sherrod's junior. Sherrod also applied for a job in Fixed Assets. The job was given to Kim Brennan, a white employee twenty-seven years younger than Sherrod. Sherrod Dep. 46.

In 1997, Sherrod was selected over several other candidates for the position of Supervisor of Bill Passing, for which position the rated minimum salary was $40,705. Larry Hoffman, PGW's then-Vice President, offered Sherrod a salary of $38,500 because, by her own admission, she was unfamiliar with the systems in the Accounting Department—in particular, an accounting system known as the "material system." Sherrod Dep. 59–60; Hoffman Dep. 34. Sherrod accepted the position at the salary she was offered. According to her own testimony, Sherrod understood that any salary increases she could expect thereafter would be based on quarterly performance evaluations. Sherrod Dep. 67–68. She assumed the position of Supervisor on September 27, 1997, at a salary of $40,000—$1,500 more than the $38,500 she had agreed to accept. On February 7, 1998, Sherrod was given an increase to $41,000, retroactive to October 4, 1997. The effect of the retroactive raise was that Sherrod had been compensated at a rate less than the $40,705 figure which was the rated minimum for the position for only one week.

The other details of Sherrod's salary history—beyond the above mentioned issues that related to her promotion to Supervisor—are not extraordinary, either in terms of amount or timing. On May 15, 1997 and April 1, 1999, she received a 4% general wage increase in conformity with the governing collective bargaining agreement. When Sherrod left PGW in 2000,

she was earning a salary of $42,640 per year.

### Sherrod's Work Environment

Sherrod's testimony in this case is replete with general characterizations of her work environment at PGW as racially hostile and otherwise unpleasant. She has purported to bolster these characterizations with four incidents in particular:

First, Sherrod alleged in her complaint that Joe Bogdonavage, then Senior Vice President of Finance at PGW, remarked that if Sherrod "could not get her African American clerks to work, he would sit at their desks with a whip for them." Compl. 5. In her deposition testimony, Sherrod later recalled the remark as lacking any reference to race. Sherrod Dep. 129.

Second, Thomas Smyth, who succeeded Larry Hoffman as Acting Vice President in February 1999, observed that the clerks under Sherrod's supervision had a habit of eating at their desks. Sherrod testified that Smyth remarked that "he didn't like the way they were eating at their desks, it must be their culture." Sherrod Dep. 195. Although Sherrod testified that she "[didn't] have a clue" as to what Smyth meant by the remark, she took it to be racist because the clerks eating at the time were black. *Id.* at 195–96. Smyth testified that he made this remark because "[c]oming in as the new vice president . . . I need to understand the company culture and how it applies to the accounting organization." Smyth Dep. 66. The same day, Smyth instituted an office policy according to which no PGW employee would be permitted to eat at his or her desk. *Id.* at 64.

Third, when Sherrod's department moved to a different location within the PGW building in early 1999, the seating for managers and clerks was rearranged. As a result of the rearrangement, all of the minority employees were seated in front of managers' offices. According to testimony not only by her white colleagues but also by Sherrod herself, this seating was based on union classifications, with the least senior employees seated in front of management offices and the more senior clerks placed in larger cubicles in the back of the floor. Sherrod Dep. 174–75; Young Dep. 53–54; Breyer Dep. 73–73. Moreover, although Sherrod testified that the union and the other clerks had taken the position that the seating arrangement was "a racist setup," she herself had no opinion as to whether it was racially motivated. Sherrod Dep. 174–75.

Fourth, shortly after taking the position of Acting Vice President, Smyth assigned to Sherrod various clerical tasks in addition to her managerial responsibilities. However, the testimony of both Smyth and Sherrod herself establishes that all PGW employees at that time were called upon to assist with clerical responsibilities to combat the backlog of unpaid bills which had resulted from the introduction of a new system of bill paying in the summer of 1998. Sherrod Dep. 134; Smyth Dep. 76.

### Sherrod's Leaves of Absence and Complaint to Human Resources

Sherrod took two sick leaves during her employment with PGW: one between December 2, 1998 and January 19, 1999, and the other between March 16, 1999 and June 8, 1999. She attributes her need for the first sick leave to stress she was experiencing at PGW. Sherrod Dep. 236. She undertook the second leave in order to care for her grandmother, who had raised her. *Id.* 224.

Prior to the second of these two leaves of absence, Sherrod lodged a complaint with PGW's Human Resources Department, stating that she was experiencing stress because of the racially hostile environment in her department. Stewart Dep. 20, 26; Pl.'s Ex. N.

### Sherrod's Resignation

In July of 1999, after her second leave of absence, Sherrod informed Ann Stewart, Manager of Staffing and Diversity at PGW, that she was not interested in returning to the Accounting Department to work for Smyth. Sherrod Dep. 108. Stewart responded by reassigning Sherrod as a Community Relations Specialist in the Public Relations Department, a position comparable in salary and work hours to her previous position. Stewart Dep. 28. Sherrod testified that she was dissatisfied with the kind of work she was asked to do in this new position, as she considered it duplicative of work that was already being conducted by her co-workers, and thus a waste of her time. Sherrod Dep. 110–112. Avowedly as a result of her dissatisfaction, Sherrod tendered her resignation from PGW on January 14, effective on February 18, 2000. She characterized the circumstances of her resignation as follows:

Q. Did anyone suggest that you should retire from PGW?

A. You're talking about PGW people?

Q. Yes.

A. Not openly.

Q. In any manner did anyone at PGW suggest that you should retire?

A. Not that I recall.

Q. So how did your retirement come about?

A. I couldn't qualify for no jobs there, so what was the point in me staying in a job that was no job?

Sherrod Dep. 118–19.

### Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Ca-* *trett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of a genuine issue of material fact is reflected in evidence from which a reasonable juror could find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At the summary judgment stage, the court must view the evidence, and draw all reasonable inferences, in the light most favorable to the non-moving party. *See Dici v. Commonwealth,* 91 F.3d 542, 547 (3d Cir.1996). However, the non-moving party may not defeat a motion for summary judgment by the mere assertion, not documented by record evidence, that the facts are sufficient to support his or her claims. *See Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1362 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993); *O'Donnell v. United States,* 891 F.2d 1079, 1082 (3d Cir.1989). Where the non-moving party "bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden." *Foulk v. Donjon Marine Co., Inc.,* 144 F.3d 252, 258 n. 5 (3d Cir.1998) (quoting *Wetzel v. Tucker,* 139 F.3d 380, 383 n. 2 (3d Cir.1998)).

### Analysis of Claims

As noted above, Sherrod has brought claims under Title VII, the ADEA, § 1981, the FMLA, and the PHRA. *See* supra p. 446. More specifically, she has alleged the following hostile work environment and disparate treatment based on racial animus in violation of Title VII (Count I); disparate treatment in the enforcement of contracts based on racial animus in violation of § 1981 (Count II); retaliation against the exercise of a lawful right under the FMLA (Count III); disparate treatment based on age in violation of the

ADEA (Count IV); and hostile work environment, disparate treatment based on age and race, and retaliation against the exercise of a lawful right in violation of the PHRA (Count V).

### Claims for Disparate Treatment Under Title VII, § 1981, ADEA and PHRA

■ To Sherrod's claims for disparate treatment under the various statutory authorities she has invoked, one analytical framework is applicable: namely, the burden-shifting framework expounded in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[1] The *McDonnell Douglas* framework was developed for claims of race discrimination under Title VII, and has since been applied to claims for disparate treatment brought under the other statutes at issue here. *See Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir.1999) (claims for disparate treatment brought under § 1981 are analyzed according to the *McDonnell Douglas* framework); *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 n. 4 (3d Cir.1995) (same for claims for disparate treatment under the ADEA); *Siko v. Kassab, Archbold & O'Brien LLP*, 2000 WL 307247, at *4 n. 1 (E.D.Pa. March 24, 2000) (same for claims for disparate treatment under the PHRA); *Pennsylvania State Police v. Pennsylvania Human Relations Commission*, 116 Pa.Cmwlth. 89, 542 A.2d 595, 599 (1988) (same).

Thus, with respect to the claims for disparate treatment under Title VII, § 1981, the ADEA and the PHRA, Sherrod and PGW are held to the following analysis "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817). PGW is entitled to summary judgment if there remains no genuine issue of material fact at any level of this framework.

The Third Circuit has observed that "the elements of a prima facie case depend on the facts of the particular case." *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 411 (3d Cir.1999). *See, e.g., Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 286 (3d Cir.2001); *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 318–19 (3d Cir.2000); *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1066 n. 5 (3d Cir.1996). Nevertheless, there is universal agreement among courts that one of the elements of a prima facie case for disparate treatment under the statutes invoked by Sherrod is the implementation by the employer of an employment action adverse to the interests of the employee. *See, e.g., Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d

---

1. In theory, Sherrod could also succeed on any of her claims of disparate impact and retaliation by direct evidence of discrimination as set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244–46, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Direct evidence of the sort comprehended by *Price Waterhouse* consists of evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption" in order to conclude that unlawful discrimination took place. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778–79 (3d Cir.1994). But Sherrod does not contend that her case features any such evidence; therefore, *McDonnell Douglas* is the applicable guide.

Cir.2001) (holding that plaintiff failed to establish a prima facie case for age discrimination under the ADEA because she "did not produce evidence sufficient to convince a reasonable fact finder that she had established any adverse employment action"); *Jones,* 198 F.3d at 410–11 (holding that "some form of 'adverse employment action,'" including but not limited to constructive discharge, is required to establish a prima facie case for disparate impact under § 1981, Title VII and the PHRA).

■ An adverse employment action sufficient to support a prima facie case must be "a significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Such an action "in most cases inflicts direct economic harm and requires an official act taken by a supervisor within the company who has the power to make economic decisions affecting employees under his or her control." *Id.* at 762, 118 S.Ct. 2257. The action must be an actual adverse action, "as opposed to conduct that the employee generally finds objectionable." *Harley v. McCoach,* 928 F.Supp. 533, 541 (E.D.Pa.1996) (quoting *Nelson v. Upsala Coll.,* 51 F.3d 383, 387–88 (3d Cir. 1995)). Sherrod has failed to establish that she suffered an adverse employment action at all—let alone an action sufficiently detrimental as to bring her within the purview of Title VII, the ADEA, § 1981, or the PHRA for the purposes of pursuing a claim for disparate treatment.

■■ As for the job opportunities for which Sherrod was passed over before 1997, Sherrod has not made her case that these omissions rose to the level of tangible adverse employment actions. A failure to promote may be deemed an adverse employment action upon proof that "[the plaintiff] was qualified for the position she sought, ... she was rejected, and ... the position remained open after her rejection or went to a less qualified applicant." *Roh v. Lakeshore Estates, Inc.,* 241 F.3d 491, 497 (6th Cir.2001). It seems that Sherrod was an eligible candidate for the positions she sought, in that she possessed the requisite four-year college degree. However, this record contains no evidence whatsoever concerning the qualifications—or lack thereof—of the individuals who were ultimately hired for the positions for which Sherrod had applied. Sherrod has not suggested that the individuals hired were less qualified than herself. Indeed, her only comment on this matter was that the authorities responsible for hiring had told her that other applicants had been more qualified than she. Sherrod Dep. 38. In addition, it bears noting that Sherrod has failed to offer any evidence beyond her own opinion that the jobs which she sought at PGW prior to 1997 were denied to her on the basis of race or age. Indeed, her own testimony as to the race—and age-based motivations for these job denials is vague and equivocal at best:

Q. Do you remember being told why you weren't getting the jobs?

A. Someone was more qualified than myself was the most reason.

. . . . .

Q. Do you believe that you were not getting these jobs because of your race?

A. It could have been a number of things. Well, the whole environment there was against race and age, the whole environment at PGW, from the day I started.

Sherrod Dep. 38–39.

■ The evidence mustered in this case also fails to support Sherrod's charges of disparate treatment in terms of compensation. Sherrod has sought to establish that she was denied salary increases and was

compensated at a level below that which would have been commensurate with her experience and skills. To the contrary, the record demonstrates that Sherrod received every salary increase to which she was entitled. Her regular pay increases while a union-rated employee were given in accordance with the union scale. Her salary adjustments in connection with her 1997 promotion to a management position were, in fact, more generous than what she had bargained for despite her agreement to start at the position of Supervisor at a salary of $38,500, she received a salary of $40,000 from her first day on that job, and after only one week she was compensated at a rate in excess of the minimum salary, given the retroactive pay adjustment of 1998.

■ Sherrod has characterized her resignation from PGW as a constructive discharge, arguing that she was effectively forced to retire by having been given a position—that of Community Relations Specialist—with which she was dissatisfied. However, Sherrod herself communicated to officials at PGW that she would be unwilling to return to work in Accounting under Smyth after her return from a leave of absence. Her placement as a Community Relations Specialist was an act of accommodation by PGW, undertaken at Sherrod's own request. Moreover, the hours and compensation in this position were identical to those associated with Sherrod's former position. To the extent that her resignation was undertaken in reaction to a job with which she was unhappy, it was clearly a voluntary act.

### Claims for Retaliation under FMLA and PHRA

■ The *McDonnell Douglas* burden-shifting framework is also the appropriate mechanism with which to analyze Sherrod's claim that she was the victim of unlawful retaliation under the FMLA and

the PHRA. *See Wilson v. Lemington Home for the Aged,* 159 F.Supp.2d 186, 194–95 (W.D.Pa.2001) (claims for FMLA retaliation may be proved through the *McDonnell Douglas* analysis); *Leung v. SHK Management, Inc.,* 1999 WL 1240961, *13 (E.D.Pa.1999) (same); *Twyman v. Dilks,* 2000 WL 1277917, *8 (E.D.Pa.2000) (same for retaliation claims brought under the PHRA). Again, in order to make a prima facie case for retaliation under these two statutes, Sherrod must establish that she suffered an adverse employment action. *See, e.g., Baltuskonis v. U.S. Airways, Inc.,* 60 F.Supp.2d 445, 448 (E.D.Pa.1999) (holding that a prima facie case of FMLA retaliation requires a showing of an adverse employment action). Sherrod's claim is that she was constructively discharged from PGW in retaliation for having taken two leaves of absence pursuant to the FMLA and for having filed a complaint with PGW's Human Resources Department regarding what she took to be a racially hostile work environment. The substance of this claim is that shortly after Sherrod's return from her second leave of absence, and shortly after she filed a grievance with PGW's Human Resources Department, she was assigned to a job with which she was dissatisfied. For the reasons given in the previous section, this turn of events cannot be deemed to amount to a constructive discharge. Sherrod did not, therefore, suffer an adverse employment action such as would be necessary to establish a prima facie case of retaliation.

### Claims for Hostile Work Environment under Title VII and the PHRA

■ Sherrod's claim that she was the victim of a hostile work environment in violation of Title VII and the PHRA must be assessed with respect to the totality of the circumstances. *See Harris v. Forklift Systems Inc.,* 510 U.S. 17, 23, 114 S.Ct.

367, 126 L.Ed.2d 295 (1993). More specifically, the court must examine the frequency of the alleged conduct, its severity, whether it was physically threatening or a mere offensive utterance, and whether it unreasonably interfered with the plaintiff's work performance. *Id.* at 23, 114 S.Ct. 367. The Third Circuit has refined this test to include the following five elements

(1) the plaintiff suffered intentional discrimination because of his or her membership in the protected class;

(2) the discrimination was pervasive and regular;

(3) the discrimination detrimentally affected the plaintiff;

(4) the discrimination would have detrimentally affected a reasonable person of the same protected class in that position; and,

(5) the existence of respondeat superior liability.

*West v. Philadelphia Elec. Co.,* 45 F.3d 744, 753–54 (3d Cir.1995) (quoting *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990)). Sherrod has simply not advanced evidence sufficient to satisfy this test.

For one thing, Sherrod has not proven specific incidents of discriminatory or harassing conduct to satisfy the second prong of the Third Circuit's five-prong test. Sherrod's own testimony features innumerable characterizations of her work environment as racist, unfriendly, and otherwise unpleasant. She repeatedly states her opinion that her white colleagues were intent on undermining her authority over her subordinate clerks; that her white colleagues formed a "clique" from which she was excluded; that she and the black clerks whom she supervised were given more work than their white peers; and that the behavior of her white colleagues and superiors constituted "disrespect." However, Sherrod has failed to offer evidence adequately particularizing these assertions. This evidentiary weakness is illustrated in the following deposition testimony

A. ... If you feel intimidated, humiliated, people looking at you, leering at you, laughing at you, is that a job?

Q. Who was laughing at you?

A. People in the PGW.

Q. Right. What people?

A. Just people in general, especially the people who call themselves professionals who are in jobs that they liked.

Q. Can you give me examples of specific people who you're referring to who were laughing at you?

A. No, I can't be that specific right now.

Sherrod Dep. 116.

More importantly, Sherrod has failed to offer any evidence—such as would be required to establish the first prong of the five-prong test—that any of her uncivil or unpleasant encounters at PGW were rendered such because of her race or age. Although Sherrod has presented fragmentary testimony as to at least one disciplinary incident and a few incidents of personality differences, the testimony contains no hint of any racial or age-discriminatory undertones to these incidents. Sherrod Dep. 139, 183–85 and 203–24.

The only examples in the record of incidents at PGW that might possibly be deemed to support Sherrod's otherwise unsubstantiated characterizations of her work environment as hostile are the four incidents noted above. To briefly revisit each will suffice to show that none rises to the level comprehended by Title VII for a hostile work environment. First, Bogdonavage's remark that he was prepared to "whip" the clerks under Sherrod's supervision bore no evidence of racial overtones. Second, there is no evidence beyond Sherrod's own opinion that Smyth's remark

about the "culture" of eating at one's desk was racially motivated—and that opinion is at least partially countered by Smyth's testimony that he was referring to a corporate "culture." Third, it is undisputed that the seating arrangement in Sherrod's department, according to which the minority employees were seated outside managers' offices, was based on union seniority rather than race. Fourth, the assignment of clerical tasks was neither limited to Sherrod nor to her black colleagues; all of PGW's employees were called upon to assist with such tasks at the time in question in order to meet the challenges imposed by the introduction of the new system of bill paying.

In sum, Sherrod has failed to establish a material issue of fact as to whether or not she suffered from a hostile work environment at PGW.

## Conclusion

Plaintiff Claudia Sherrod has not mustered sufficient evidence as to any of her claims of discrimination to survive PGW's motion for summary judgment. Her contentions that she was treated differently than her younger, white peers in violation of Title VII, § 1981, the ADEA and the PHRA fail because she did not suffer an adverse employment action. Her claims that she was the victim of retaliation for having availed herself of lawful rights under the FMLA and the PHRA are not meritorious for the same reason. Finally, she has not met her burden of proof that her experiences at PGW amounted to a hostile work environment in violation of Title VII and the PHRA. For these reasons, PGW's motion will be granted.