**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0733n.06
Filed: October 4, 2006

**No. 05-6311**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JERRY P. FREEMAN | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| JOHN E. POTTER, POSTMASTER GENERAL, | ) | **O P I N I O N** |
| UNITED STATES POSTAL SERVICE | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

**BEFORE:** **SILER, CLAY, and McKEAGUE, Circuit Judges.**

**McKEAGUE, Circuit Judge.** Plaintiff Jerry Freeman sued the Postmaster General of the United States Postal Service (the "Postal Service"), alleging that the Postal Service discriminated against him by failing to transfer him to another position, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 633a, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16. The district court granted summary judgment in favor of the Postal Service, finding that Freeman did not suffer an adverse employment action, and therefore did not carry his *prima facie* burden. Freeman appealed.

For the reasons set forth below, we affirm.

**I.**

Freeman was Supervisor of Customer Service at the Murfreesboro, Tennessee Post Office and had worked for the Postal Service for more than twenty-five years when he applied for the position of Postmaster of Sewanee, Tennessee. He was fifty-two years old at the time.

Salaried employees of the Postal Service each have a ranking on the "Executive and Administration Schedule" or "EAS," a pay and duty schedule. As a Supervisor in Murfreesboro, Freeman held a ranking of EAS-16. The Sewanee position was ranked as an EAS-15. This meant that the salary for the Postmaster position was lower than the salary he received in his current Supervisor position.

In his application for the Postmaster position, Freeman listed the following highlights of his duties as a Supervisor:

- supervise and schedule thirty-nine rural carriers on a daily basis;

- supervise five full-time and five part-time window clerks;

- supervise several Special Event Programs, including special cancellations for the Civil War, the Stones River National Battlefield, and the Uncle Dave Macon Days stamps; and

- was responsible for bar code sorter machines, qualifying part-time distribution clerks, and various educational tours.

During his deposition, Freeman estimated that an EAS-15 Postmaster might have responsibility for two rural carriers, a box section, and two or three window clerks.

Freeman grew up ten or twelve miles from Sewanee and knew many of the people who lived there. He testified that he sought the lower-paying position because it would give him better

advancement opportunities in the future. He noted that Postmasters have their own meetings, and, if selected, he would be able to participate in those meetings. He also wanted the opportunity to run his own office, explaining that it would have less pressure. He testified that he had planned to apply for a higher-level Postmaster position within a couple of years of becoming the Sewanee Postmaster.

Bonnie Layne, a Postmaster near Sewanee, testified by affidavit that the Sewanee Postmaster position was "a unique and desirable position." She further testified:

> In general, postmaster positions in the United States Postal Service are considered desirable and are sought after even in preference to supervisor positions. This is because as a postmaster you are the on site person responsible for running the location and have no supervisor on site to whom you must report. Further, in my experience, being a postmaster is considered prestigious. Because of this, it does not surprise me that a supervisor in the United States Postal Service would be willing to take an initial marginal decrease in salary to obtain a postmaster position.

She also noted that the proximity to a small university made the position "unique and more prestigious."

Another applicant for the Sewanee position, Wanda Eisler (also an EAS-16 at the time), testified that she wanted the job because being a Postmaster was her ultimate goal. She explained that she wanted a small office.

The Postal Service did not select Freeman or Eisler for the Postmaster position, offering it instead to a thirty-one year old female. Freeman filed an administrative complaint, alleging age and reverse-sex discrimination. The ALJ determined that the Postal Service did not discriminate against him based on his sex, but agreed with Freeman that it discriminated against him based on his age. As the remedy, the ALJ required that the Postal Service offer Freeman the Sewanee Postmaster position. It did so, but Freeman declined the position, opting instead to sue the Postal Service,

alleging workplace discrimination and seeking back pay and benefits, front pay, compensatory damages for emotional and reputational injury, attorney fees, and expenses.

## II.

### A.    Fed. R. Civ. P. 56

The court reviews *de novo* the district court's grant of summary judgment. *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547 (6th Cir. 2004) (citations omitted). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court reviews the evidence and draws all reasonable inferences in favor of the nonmoving party. *Rowan*, 360 F.3d at 547 (citation omitted). "That is not to say that it only reviews evidence favorable to the non-moving party. Instead, it must review all the evidence in the record." *Id.* (citation omitted).

### B.    Adverse Employment Actions – In General

The ADEA prohibits federal employers, including the Postal Service, from discriminating against an employee "based on age." 29 U.S.C. § 633a. Title VII likewise prohibits discrimination based on, among other things, an individual's gender. 42 U.S.C. § 2000e-16(a). The legal standards governing both types of discrimination are similar. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996).

A plaintiff may establish age- or gender-based discrimination in two different ways. He may offer direct evidence of the employer's discriminatory motive by producing "evidence, which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir.2003) (en banc)). If he cannot come forward with direct evidence of a discriminatory motive, he may offer indirect and circumstantial evidence of such a motive under the familiar *McDonnell-Douglas* burden-shifting approach. *Id*. (citation omitted). Under the latter approach, the employee must show that (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the position sought; and (4) he was treated differently from similarly situated employees outside the protected class. *McClain v. NorthWest Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 332 (6th Cir. 2005). The elements of a *prima facie* case are fact-specific and differ from case to case. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999).

The sole issue presented to us on appeal is whether Freeman has offered sufficient evidence to create a genuine issue of material fact that he suffered an adverse employment action. An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (citations omitted). Such action usually "inflicts direct economic harm." *Id.* at 762. An employment action must amount to "a materially adverse change" in the terms or conditions of employment to be actionable. *Kocsis*, 97 F.3d at 885; *see also Mitchell*, 389 F.3d at 182. The action "must be more

disruptive than a mere inconvenience or an alteration of job responsibilities." *Kocsis*, 97 F.3d at 886 (internal quotations omitted). A "*de minimis* employment" action is "not materially adverse and, thus, not actionable." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000). In other words, a "bruised ego" caused by trivial employment actions is not sufficient. *Kocsis*, 97 F.3d at 886 (citing *Flaherty v. Gas Research Inst.*, 315 F.3d 451, 456 (7th Cir. 1994)).

Yet, an employee need not have suffered one of the "ultimate employment actions" listed above (e.g., termination, demotion, failure to promote, etc.) to have a viable claim of discrimination. A material adverse action may consist of a less distinguished title, diminished options for advancement, or other unique indices. *Bowman*, 220 F.3d at 461-62; *Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir. 1999). Importantly, however, an individual's "subjective impression concerning the desirability of one position over another" is insufficient to render an employer's action materially adverse. *Mitchell*, 389 F.3d at 183; *see also Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002). Rather, we determine whether a particular employment action was "objectively intolerable to a reasonable person." *Policastro*, 297 F.3d at 539; *see also O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004) (explaining that an employee's "purely subjective preferences for one position over another" does not "justify trundling out the heavy artillery of federal antidiscrimination law" (internal quotations omitted)); *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999) (explaining that an employee must suffer "objectively tangible harm" to have a viable discrimination claim).

In short, the action must have a "significant detrimental effect" on the employee's status, *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999), as evidenced by objective factors, not subjective

impressions.

## C.     Did Freeman Suffer an Adverse Employment Action?

To support his claim, Freeman points to a single action by the Postal Service: its decision not to transfer him to the Sewanee Postmaster position. As in prior cases involving a request for a new position within the same employer organization, we view Freeman's claim as one grounded on a failure to promote/transfer, as opposed to one based on a failure to hire.[1] *See, e.g.*, *Browning v. Dep't*

---

[1]In his dissent, Judge Clay suggests that we are breaking new ground by requiring that Freeman present evidence that the Postal Service denied him a promotion or took some other tangible action that had a significant detrimental effect on him, and not just that it denied him a transfer. On the contrary, it is Judge Clay who proposes, in effect, that we depart from this circuit's precedent, as well as the guidance provided by the Supreme Court.

In *Mitchell*, an earlier, published decision of this court to which we are bound to follow, a medical school professor sued his university employer for age discrimination. As part of his *prima facie* case, the plaintiff relied upon, among other things, his non-selection for an internal transfer to become the medical director of a laboratory. The court found the plaintiff's evidence to be insufficient to establish his *prima facie* case, explaining:

> Non-selection for a position of employment is not always an adverse employment action. In cases where the sought position is a lateral transfer, without additional material benefits or prestige, it would be improper to conclude that a denial of such a transfer would be a materially adverse action. *See Sherman v. Chrysler Corp.*, 47 Fed. Appx. 716, 721-22 (6th Cir. 2002) (holding that an employee who failed to introduce evidence showing that denials of lateral transfer requests resulted in materially adverse changes in terms of employment could not establish adverse employment action).

*Mitchell*, 389 F.3d at 183. Simply put, the *Mitchell* decision cannot be squared with the dissent's approach.

Even if we were not bound by *Mitchell*, the proper approach would still be the one we employ here. The Supreme Court has provided guidance to lower courts on what constitutes an

*of Army*, 436 F.3d 692, 695-96 (6th Cir. 2006); *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005); *Mitchell*, 389 F.3d at 183.

In general, a lateral transfer, or the refusal to make a lateral transfer, is not a materially adverse action. *Mitchell*, 389 F.3d at 183.[2] Freeman offers no evidence that the refusal-to-transfer

---

adverse employment action. In *Ellerth*, the Supreme Court did not limit the category of such actions to the obvious ones of "hiring" and "firing," but also, among other actions, "failing to promote." 524 U.S. at 761. As a textual matter, the Court's inclusion of "failing to promote" in this category would have been superfluous if it intended for lower courts to treat all claims involving the denial of a requested internal transfer as simply "hiring" claims. Moreover, it would breed considerable confusion in the law to conflate external hiring and internal transfers into one broad "hiring" camp, especially when the Supreme Court has counseled (at least implicitly) otherwise.

Thus, we agree with the dissent that the *prima facie* test is a "flexible" one, and must be applied in an "orderly way to evaluate the evidence." Dis. at 2-3. The test must be tailored to meet the demands of the particular claim before the court. In the instant action, we have tailored the *prima facie* test to the claim before us, using our own precedent and the Supreme Court's guidance on what constitutes an adverse employment action. To try to consider Freeman's claim under some broad, rigid "hiring" framework would, in effect, be to force a square peg into a round hole.

Finally, we note that Freeman did not argue on appeal that his was a failure to hire claim. Rather, he repeatedly referred to the "unique" and "prestigious" nature of the position, and cited several transfer-related cases in support.

[2]Given the fact-specific nature of the inquiry, there are a number of cases that have concluded that a transfer or refusal-to-transfer did not constitute an adverse employment action, and a number that have found such employer action was adverse. *Compare O'Neal*, 392 F.3d at 912 (rejecting for lack of "objective evidence" the employee's claims that her involuntary transfer resulted in a less prestigious job and negatively affected her advancement opportunities); *Mitchell*, 389 F.3d at 182 (finding no adverse action from a professor's allegations that the university "deprived him of a graduate research assistant during one summer, revoked his mentor status in the M.D./Ph.D graduate program, and removed him from his position of Medical Director of Pathology Laboratory Services"); *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (finding no adverse action when employee wanted transfer for personal reasons and transfer would have resulted in lower pay); *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003) ("[A] decision made by an employer that only limits an employee's opportunities for promotion or lateral transfer does not qualify as an adverse employment action under Title VII."); *Momah v. Dominguez*, No. 03-

denied him a promotion, at least in any official sense. He points to no policy or procedure of the

Postal Service suggesting that it would consider a move from an EAS-16 Supervisor to an EAS-15

Postmaster a promotion. The Sewanee Postmaster position paid less, and thus, from a purely

financial perspective, the transfer would have been a demotion. Freeman argues, however, that in

spite of the loss of pay, the Sewanee Postmaster position was unique for two main reasons: (1) it was

prestigious; and (2) the experience would have given him opportunities for higher-paying Postmaster

positions. The two factors are analyzed in turn.

### 1.    Prestige

Freeman cites this court's statement in *Mitchell* that "[i]n cases where the sought position

is a lateral transfer, without additional material benefits *or prestige*, it would be improper to

conclude that a denial of such a transfer would be a materially adverse action." 389 F.3d at 183

---

2561, 2006 U.S. App. LEXIS 6669, at *30-31 (6th Cir. Mar. 15, 2006) (finding no adverse action when requested transfer would have been a demotion and was sought for personal reasons); *Wanchik v. Great Lakes Health Plan, Inc.*, 6 F. App'x 252, 258-59 (6th Cir. 2001) (finding no adverse action when corporate acquisition resulted in the employee transferring from CEO of the target company to vice president of the acquiring company), *with Jones*, 198 F.3d at 411-12 (finding an adverse employment action when a teacher was transferred to a "difficult school" teaching "less desirable science classes" and was passed over for promotion); *Davis v. City of Sioux City*, 115 F.3d 1365, 1369 (8th Cir. 1997) (upholding jury verdict, explaining that "[t]he jury apparently put more weight on Davis's evidence that the new position lacked supervisory status, had fewer opportunities for salary increases, and offered Davis little opportunities for advancement."); *Bryson v. Chicago State Univ.*, 96 F.3d 912, 916 (7th Cir. 1996) (concluding that an employee's "sudden loss" of the title Special Assistant to the Dean and her banishment from university committee work could constitute adverse employment action); *de la Cruz v. N.Y. City Human Res. Admin. DSS*, 82 F.3d 16, 21 (2d Cir. 1996) (finding that the involuntary transfer of a caseworker from the adoption unit to the foster care unit could be an adverse employment action because of the lower prestige and "little opportunity for professional growth" in the new unit, but also noting that the employee's case was "quite thin").

(citation omitted, emphasis added). Other courts have similarly noted that "prestige" and "loss of title" can amount to adverse employment action under some circumstances. *See, e.g.*, *Bryson*, 96 F.3d at 916; *de la Cruz*, 82 F.3d at 21.

"Prestige," much like beauty, is in the eye of the beholder. It is the "standing or estimation in the eyes of people." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986). Yet, because we rely upon objective factors, rather than subjective impressions, we must look underneath an assertion of "prestige" to determine whether there is anything concrete to substantiate it. For example, does a particular title entail greater responsibilities, have unique characteristics, or require special training or education? *See, e.g.*, *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 803 (6th Cir. 2004) (en banc) (noting that the higher level of qualifications needed for a position was an indication of the position's prestige), *aff'd*, 126 S. Ct. 2405 (2006); *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997) (explaining that negative public perception alone does not amount to an adverse employment action). Further, an employee must show that the target position had, in some sense, *more* prestige than the employee's current position. If the two positions have the same level of prestige, the refusal to transfer the employee from one prestigious position to an equally prestigious position cannot have an actionable effect on the employee's career. *See Kocsis*, 97 F.3d at 887 (noting the failure of the employee "to make a real attempt to compare the two positions" before filing suit).

Here, Freeman offers several reasons why the Postmaster position in general, and the one in Sewanee in particular, was prestigious. He testified that as a Postmaster, he would be "in the limelight" in terms of controlling the office, making budgets and plans, and increasing revenues.

Layne reiterated this, as well as stating that the position's proximity to a small university also made it prestigious.

Being the head of an office with responsibility for its budget and plans can be prestigious. Of course, so can being a supervisor in a large office with responsibility for thirty-nine carriers, ten window clerks, and various special event programs and educational tours. Moreover, the fact that he was paid more as a Supervisor in Murfreesboro is at least some evidence of its prestige vis-à-vis the Sewanee Postmaster position. While Layne testified that Postmaster positions are considered desirable and are sought after even in preference to supervisor positions, this is simply a statement about postmaster positions *in general*. She did not offer any specific comparison between the prestige of the two particular positions at issue here – Freeman's Supervisor position (or one similar to it in terms of size of office and responsibilities/qualifications) against the Sewanee Postmaster position.

The evidence that the Sewanee Postmaster position is prestigious because it is located near a small university is entirely conclusory. Freeman provides no evidence or explanation of why a Postmaster who works in an office serving a university is more prestigious than the same position in a neighboring town or city without a university. There is no description of additional or special tasks the Postmaster must perform for the school, special access the Postmaster might have to school facilities, or any other objective indicia of prestige bestowed upon the Postmaster by the Postal Service, university, or community. Moreover, unlike a typical vendor for a college or university, the Postmaster cannot tout its office's selection by the school as some sign of excellence, given that the Postal Service has a federally-chartered monopoly in delivering mail. The position may be more

*desirable* because it is located in a university town with, for example, ready access to collegiate athletic events, arts, community lectures, etc., but simply because a position is desirable to someone does not make the failure to get it actionable. *Mitchell*, 389 F.3d at 183.

It is Freeman's burden to show that the refusal-to-transfer resulted in him having to stay in a less prestigious position. He has not met his burden.

### 2. **Experience**

Freeman also argues that the experience he would have gained as the Sewanee Postmaster would have given him more opportunities for future promotion. The refusal to transfer, like an involuntary transfer, can amount to an adverse employment action if it significantly reduces the employee's career prospects. *See, e.g.*, *O'Neal*, 392 F.3d at 911. The Postal Service provided numerous examples of Supervisors at or below Freeman's EAS rank moving to the position of Postmaster. Freeman admitted during his deposition that his belief that the Sewanee Postmaster position would have given him an opportunity to advance was speculation. Furthermore, as explained above, Layne's testimony does not evidence that Freeman's own prospects for advancement were hindered in any non-trivial way. Again, it was Freeman's burden to compare the two positions and offer objective indications of the superiority of one over the other. *Kocsis*, 97 F.3d at 887. He did not do so.

### 3. **Freeman Has Not Shown a Non-Trivial Impact on his Career**

In sum, Freeman has provided some evidence that a Postmaster is generally considered a

prestigious position in the Postal Service, and that the Sewanee Postmaster position is a desirable one. What he has not done is come forward with evidence of objective indicia which would show: (a) that the Sewanee Postmaster position was more prestigious than his own position; or (b) that the experience of being a Sewanee Postmaster would significantly enhance his career opportunities more than his current position. Accordingly, Freeman has not made his *prima facie* case of discrimination.

**III.**

For the foregoing reasons, we AFFIRM summary judgment in favor of the Postal Service.

**CLAY, Circuit Judge, dissenting.**     Plaintiff has carried his burden on summary judgment of presenting evidence that he suffered an actionable adverse employment action.  Contrary to what the majority opinion avers, a company's refusal to hire a current employee into a posted, open position, for which the company is actively evaluating candidates, raises the necessary inference of discrimination to satisfy the *prima facie* case.  The Postal Service's refusal to hire Plaintiff constitutes the adverse employment action in the instant case.  In the alternative, even under the majority's formulation of the rule, I would find that Plaintiff has carried his burden on summary judgment because he has presented objective evidence from which a rational trier of fact could conclude that a Postmaster position in a small office is objectively more prestigious than a supervisor position in a larger office.     **1.     Plaintiff Has Raised the Necessary Inference of Discrimination**

The majority avers that Plaintiff has failed to show that he can meet the second prong, the "adverse employment action" requirement, of the four-factor *prima facie* test, as this Circuit requires under the *McDonnell Douglas* burden-shifting evidentiary approach.  The majority reaches its conclusion because it views this case as a failure to transfer case, in light of Plaintiff's current employment with the Postal Service.  In failure to transfer cases, this Court has held that the employer "action" – either effecting an involuntary transfer or denying a request to transfer – must somehow result in a materially adverse effect on the plaintiff's employment.  This case is not, however, a failure to transfer case.  Rather, the Postal Service was actively seeking candidates for the position of Sewanee, Tennessee postmaster.  Plaintiff underwent a formal application and evaluation process, and instead of hiring Plaintiff, the Postal Service hired a much younger, female

applicant with much less experience than Plaintiff. The adverse employment action is therefore the refusal to hire, and the majority's attempt to hold Plaintiff to a higher evidentiary threshold ignores Supreme Court direction that the *prima facie* test is meant as a flexible standard comprised only of those elements which, absent explanation, raises an inference of discrimination. Moreover, the majority's approach belies Supreme Court pronouncements on failures to transfer and what constitutes a "materially adverse" action under Title VII.

a.     *The Prima Facie Test Is a Flexible Standard*

The *McDonnell Douglas* Court was faced with an employer who refused to rehire a layed-off machinist who had engaged in civil rights protests against the employer. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Court held that to survive summary judgment, a plaintiff had to present a *prima facie* case of discrimination. *Id.* at 802. The Court set fourth a four-factor test for the *prima facie* case:

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a *prima facie* case of racial discrimination. This may be done by showing
>
> (i)     that he belongs to a racial minority;
> (ii)    that he applied and was qualified for a job for which the employer was seeking applicants;
> (iii)   that, despite his qualifications, he was rejected; and
> (iv)    that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* (formatting added).

The Supreme Court further explained that the elements necessary for the *prima facie* case are not inflexible, as "[the] facts necessarily will vary in Title VII cases, and the specification above of the *prima facie* proof required . . . is not necessarily applicable in every respect in differing factual

situations." *Id.* at 802 n.13. The Supreme Court has since repeated that "[t]he *prima facie* case method established in *McDonnell Douglas* was 'never intended to be rigid, mechanized, or ritualistic. Rather it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). Moreover, the Supreme Court has emphasized that the presentation of a *prima facie* case is not meant to be "onerous," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and is generally satisfied upon a showing of "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act," *Furnco*, 438 U.S. at 576 (internal quotations omitted); *see also Daniels v. Bd. of Educ.*, 805 F.2d 203, 207 (6th Cir. 1986). "Thus, 'the central inquiry in evaluating whether the plaintiff has met his initial burden is whether the circumstantial evidence presented is sufficient to create an inference [of discrimination].'" *Shah v. Gen. Elec. Co.,* 816 F.2d 264, 268 (6th Cir. 1987) (quoting B. Schlei and P. Grossman, *Employment Discrimination Law* 247 (Supp. 1983-84)).

        b.       *Supreme Court Direction on "Materially Adverse" Employment Actions*

In addition to the Supreme Court's direction that the *prima facie* test is meant as a flexible standard, the Supreme Court has issued other directives relevant to Title VII and discrimination law that counsel against adopting the majority's approach. First, the Supreme Court has continued to treat failure to promote claims with the *McDonnell Douglas* formulation of the *prima facie* case, requiring only that a plaintiff show that she was qualified for an available position, applied for the

position, did not get the position, and that the position remained open or was filled by someone outside the plaintiff's protected class. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186-87 (1989). Were the Supreme Court inclined to agree with the majority's approach, the Court would most likely inquire into whether the disputed position was somehow a better position than the plaintiff's extant job, rather than merely asking whether the plaintiff applied for a job for which he or she was qualified.

Second, the Supreme Court has held that "Title VII is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to 'strike at the entire spectrum of disparate treatment . . . ' in employment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (quoting *Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978)). The majority's conclusion that an employer's failure to hire an internal candidate is not "materially adverse" to the employee seems to contradict this expansive interpretation of Title VII, an interpretation recently reaffirmed in *Burlington N. & Santa Fe Ry. Co. v. White*, – U.S. – , 126 S. Ct. 2405 (2006).

The *White* Court was asked to decide what types of employer actions were prohibited under Title VII's anti-retaliation provision. In reaching its decision, the Supreme Court reasoned that, unlike the substantive discrimination provision, the anti-retaliation provision of Title VII reached "beyond workplace-related or employment-related retaliatory acts and harms." *Id.* at 2414. The Supreme Court maintained, however, that whatever the challenged action might be, it must still be "materially adverse" to the plaintiff. *Id.* at 2415. This is the same "material adversity" that is required to trigger Title VII protections under the civil rights act's substantive discrimination

provision, the provision at issue in the instant case.[3]   Moreover, in discussing material adversity in *White*, the Supreme Court looked to examples which *were* "employment related."  The discussion and application of the "materially adverse" test in *White*, therefore, is instructive for the case at bar.

In defining "materially adverse" in the retaliation context, the Supreme Court noted that things like "petty slights," "snubbing" and "general antipathy" could not be construed as materially adverse.  *Id.*  The Court noted, however, that under the right circumstances, even a scheduling change or the denial of "flex time" could be a "materially adverse" action – for example, when done with respect to a worker with school-age children.   The Court therefore recognized that although a judgment of whether an action is materially adverse must be made from an objective standpoint, such a judgment must be made from the perspective of a reasonable person *in the plaintiff's position*.  *See id.*   In addition, the Court reemphasized the need for standards suited to the varying circumstances inherently implicated in Title VII cases: "We phrase the standard in general terms because the significance of any give act of retaliation will often depend upon the particular circumstances.  Context matters."  *Id.*  This direction from the Supreme Court appears to strongly counsel against a mechanistic and wholesale application of the constituent elements of an "adverse employment action" from one case to the next.  Rather, the Court has instructed us that "context matters," and we should instead look to the situation before the Court, asking only what circumstances give rise to an inference of discrimination.

---

[3]In substantive discrimination cases, such as the case at bar, the materially adverse action must relate to the "compensation, terms, conditions, or privileges of employment."  *White*, 126 S. Ct. at 2414; 42 U.S.C. § 2000e-2.

The Supreme Court's examples of what could constitute a materially adverse employment action in *White* are consistent with the Court's past treatment of failures to transfer as discrete employment actions implicating Title VII concerns. In *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001), the Supreme Court addressed a plaintiff's allegations of retaliation, in part, through a unilateral transfer. The Supreme Court focused on whether the alleged transfer was causally linked to the plaintiff's protected Title VII activity, and not whether the new position was somehow "better" or "worse" than the employee's old position. *Id.* In the very next term, in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 114 (2002), a hostile environment case, the Supreme Court again indicated that a transfer is akin to a failure to hire or promote: "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.*[4] These cases indicate that the Supreme Court would view a company's failure to hire an internal candidate into an open and advertised position as a "materially adverse" employment action under Title VII, an action which, if left unexplained, could be construed as an act of prohibited discrimination affecting the "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2; *White*, 126 S. Ct. at 2410 (defining "discriminate

---

[4]Although these decisions predate *White*, the *White* decision does not call into question their continuing applicability to cases dealing with employment-related actions, insofar as *White* merely *expanded* the scope of redressable behavior beyond these employment-related actions under the Title VII retaliation provision. To the extent that these cases address materially adverse employment actions, they remain good law as applied to Title VII substantive discrimination cases.

against" in § 2000e-2 as "distinctions or differences in treatment that injure protected individuals").[5]

      c.      *The "Materially Adverse" Action in the Case at Bar is the Failure to Hire*

As the Supreme Court has made clear, the *sin qua non* of the *prima facie* case is evidence that, absent explanation, raises an inference of discrimination. An employer's failure to hire an internal candidate into a posted position, which the employer advertised as open and ready to be filled, is analogous to an employer's failure to hire an external candidate as treated by the Supreme Court in *McDonnell Douglas.* The failure to hire is the "adverse employment action" in the plaintiff's *prima facie* case. When an employer fails to hire an external candidate who is otherwise qualified for the position, and the position is either left open or is filled by a candidate outside of the protected class, then the initial showing of discrimination is made, and the *prima facie* case is completed. *McDonnell Douglas*, 411 U.S. at 802 n.13. This same inference of discrimination arises when an employer rejects an otherwise qualified internal candidate for an open, posted position and instead hires someone outside of the plaintiff's protected class.

It is incongruous to argue, as the majority does, that the Postal Service's refusal to hire Plaintiff for the postmaster position cannot be the adverse employment action in the instant case. The majority reaches this conclusion because it reasons, incorrectly, that the refusal to hire cannot be materially adverse because the Postal Service was not refusing Plaintiff an objectively "better"

---

[5] This reading of *Clark County* and *National Railroad* is buttressed by the Supreme Court's treatment of hiring, promotion, transfer, and recall decisions as equivalent employment actions in the First Amendment context. *See Rutan v. Republican Party*, 497 U.S. 62, 79 (1990) (holding unconstitutional a state law which imposed party affiliation requirements on lower level state employees).

position. The Postal Service advertised the position as open to applications by all qualified personnel. Ostensibly, only internal personnel could be considered for the job, inasmuch as the postal service is a unique operation with a partial monopoly over the mails, authorized by the federal government. The parties agree that job opportunities within the Postal Service are available on a merit basis, thereby constituting a "privilege" of employment. When Plaintiff was denied the postmaster position, he was being denied a "privilege" of his employment, *i.e.*, access to job opportunities on the basis of merit. Moreover, because the postmaster position is objectively distinct from Plaintiff's current supervisor position, there is no doubt that the Postal Service's refusal to hire Plaintiff into the position affected his "conditions" of employment. These effects are "materially adverse" to Plaintiff's interests to the same extent had the Postal Service refused to hire Plaintiff in the first instance as an entry-level mail carrier.

In the instant case, Plaintiff has shown: 1) that he belongs to a protected class under Title VII and the ADEA; 2) that Plaintiff was qualified for the postmaster position; 3) that Plaintiff applied for and did not receive the position; and 4) that a much younger, female applicant (with much less experience) was hired instead. Absent some rational explanation by the Postal Service, these facts raise the inference that the successful applicant received the job because of either her gender or her age. These facts therefore produce the same inference of discrimination that the Supreme Court held was sufficient to satisfy *the prima facie* case in *McDonnell Douglas*.

       d.      *Practical Deficiencies in the Majority's Approach*

This Circuit has come to use the "adverse employment action" phrase as a placeholder for the employer action which, when taken in context, gives rise to an inference of discrimination. It is important, however, when this Court uses the adverse employment action language, that we remain cognizant of the various situation in which we have chosen to apply the term. The definition and components of an adverse employment action from one set of circumstances – for example, an involuntary transfer – will not necessarily serve to describe a suspicious employer action in a different factual context. Rather, we need to remember the Supreme Court's admonition that the *prima facie* case will vary according to the facts before the Court, *McDonnell Douglas*, 411 U.S. at 802, and that "an act that would be immaterial in some situations is material in others." *White*, 126 S. Ct. at 2416 (internal quotation and citation omitted). Instead of following the Supreme Court's direction to fashion and apply a flexible *prima facie* test, the majority has mechanistically relied on a formulation of adverse employment action which has developed over time in circumstances highly dissimilar to the case at bar. Indeed, the development of the "adverse employment action" requirement in our Circuit demonstrates this Court's overreliance on language and test formulations articulated in prior cases without inquiring into whether such wholesale application serves the purpose the *prima facie* test is meant to serve for the case at hand: facts and evidence which suggest discrimination – no more, and no less.[6]

---

[6]The "adverse employment action" was first articulated by this Court as variation of the "did not get hired" prong of the *McDonnell Douglas prima facie* test to serve the Court's evaluation of a plaintiff's evidence in Title VII retaliation cases. *See Brown v. Marks*, No. 81-3477, 1983 U.S. App. LEXIS 13349 (6th Cir. Mar. 3, 1983) (unpublished opinion). This variation made sense, as the adverse employer action is the *sin qua non* in the retaliation context, just as the failure to get the job is the *sine qua non* in the hiring context. As case law developed, however, this Court has come to

The majority's version of the "adverse employment action" largely relies on a supporting definition for the phrase developed in response to involuntary transfer scenarios.[7] This Court then expanded the use of the "adverse employment action" as defined in involuntary transfers to situations involving denials of *ad-hoc*, voluntary transfer requests. *See, e.g.*, *Kocsis v. Multi-Care Mgt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (involuntary lateral transfer) (requiring involuntary transfer to be "materially adverse" to plaintiff in order to constitute an adverse employment actins); *Strouss v. Mich. Dep't of Corrs.*, 250 F.3d 336, 343 (6th Cir. 2001) (involuntary lateral transfer) ("[P]urely personal reasons for turning down a transfer are not sufficient to render a transfer an adverse employment action."); *Reese v. State of Mich. Family Indep. Agency*, 31 Fed. App'x 172, 174 (6th Cir. 2002) (unpublished opinion) (holding that the employer's rejection of *ad hoc* transfer request could not amount to an adverse employment action). Today, the majority imports wholesale the elements of the adverse employment action in these involuntary and *ad-hoc* transfer circumstances into a failure to hire situation.

The definitional components of the adverse employment action in the above types of transfer contexts, however, do not necessarily translate to the case at bar. With an involuntary transfer,

---

use "adverse employment action" as a placeholder phrase for an employment action which, when taken in context, gives rise to an inference of discrimination. *See Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 940 (6th Cir. 1987) (using the "adverse employment action" language for the first time in the articulation of the *prima facie* case requirements outside of the retaliation context).

[7]The Court first applied the adverse employment action requirement to an involuntary transfer case in *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987) (reasoning that the plaintiff's involuntary transfer could not be an adverse employment action because she "continued to receive the same salary and benefits" as she had prior to the transfer).

whether the transfer is to a job which is somehow worse than the employee's current position certainly seems to serve the Supreme Court's direction that the *prima facie* case requires a showing of "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act." *Furnco*, 438 at 576 (internal quotations omitted); *see also Daniels*, 805 F.2d at 207. In contrast, when an employer advertises an open position, whether that position is somehow a "better" job than an employee's current position, does not inform the inquiry of whether the employer's actions were based on discriminatory intent. Instead, those circumstances which raise the inference of discrimination are precisely those circumstances from which a factfinder could legitimately infer discriminatory intent in a failure to hire case: 1) a plaintiff in a protected class; 2) a posted, open position for which the plaintiff is qualified; 3) a rejection by the employer; and 4) the position either remaining open or going to someone outside the protected class.

The majority's standard presents unacceptable implications. Under the majority's formulation, an internal candidate for a posted, advertised position has a higher evidentiary threshold under Title VII and ADEA than an external candidate for the same position. An external candidate for an advertised position can make a *prima facie* case of discrimination merely by showing that the employer failed to hire the candidate. This is a direct application the *McDonnell Douglas* case. The failure to hire is the "adverse employment action" in the language of this Circuit. The internal candidate, however, must show that the position was somehow objectively better (more money, better benefits, more prestige, etc.) than the position which the internal candidate already filled. The external candidate has no such additional requirement. One might ask why an employer's failure

to hire an external candidate constitutes the "adverse employment action" for that candidate, but the same failure to hire does not constitute the "adverse employment action" for the internal candidate. The courts do not ask whether the external candidate would be leaving a position which is just as objectively "good" as the position being sought. The internal candidate should be treated the same.

Finally, the majority's decision aligns this Court with only one other circuit court of appeals. Four other Circuits have addressed the question of whether an employer's failure to hire an internal candidate can constitute an adverse employment action absent some additional showing. The First, Ninth, and Tenth Circuits have indicated that an employer's failure to transfer an employee into a open, posted position, for which the employee applied, constitutes an "adverse employment action" on the same basis as a failure to hire an external candidate. *See Amro v. The Boeing Co.,* 232 F.3d 790, 797-98 (10th Cir. 2000) (treating a failure to transfer claim as a failure to hire claim); *Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir. 1997) (finding a refusal to transfer an actionable Title VII action when such transfers were common enough to support a finding that they were "privileges" of employment); *Bouman v. Block*, 940 F.2d 1211, 1229 (9th Cir. 1991) ("The fact that the position was not made available to [plaintiff] . . . is sufficient [to establish an adverse employment action].") In contrast, only one other circuit has applied the majority's standard to an employer's denial of a plaintiff's request to transfer/be hired into a open, posted position. *Brown v. Brody*, 199 F.3d 446, 455-56 (D.C. Cir. 1999). Today's decision aligns the Sixth Circuit with the D.C. Circuit and not the majority of our sister circuit courts of appeals.

I would therefore treat this case as a failure to hire case and find that Plaintiff has shown that he has suffered an adverse employment action.

**II.      As a Failure to Transfer Claim, Plaintiff Has Carried His *Prima Facie* Burden**

Under the majority's formulation of the *prima facie* case, Defendant's denial of Plaintiff's

application for the postmaster position must amount to a failure to promote Plaintiff – *i.e.*, a denial

of increased pay, benefits, prestige, or opportunity for advancement.  *See Mitchell v. Vanderbilt*

*Univ.*, 389 F.3d 177, 183 (6th Cir. 1994).   Therefore, the denial of a transfer is an adverse

employment action if the transfer would have resulted in "an increased salary, significantly changed

responsibilities, a more distinguished title, or a gain in benefits."  *Id.*  However, again under the

majority's formulation, "a plaintiff's subjective impression concerning the desirability of one

position over another generally does not control with respect to the existence of an adverse

employment action."  *Id.*

In the instant case, Plaintiff presents more than his subjective impression that the postmaster

position was more prestigious than his current supervisor position.[8] Plaintiff presents testimony from

---

[8] The majority opinion relies on *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177 (6th Cir. 2004), for the proposition that there was no adverse employment action against Plaintiff.  This reliance is misplaced.  In *Mitchell*, this Court found that a plaintiff alleging age discrimination did not experience an adverse employment action where the defendant articulated a legitimate and nondiscriminatory reason for not hiring the plaintiff for the position he sought.  389 F.3d at 181-82.  The Court found "nothing to indicate that the appointment would have provided an increased salary, significantly changed responsibilities, a more distinguished title, or a gain in benefits."  *Id*. at 183.  "Mitchell was not the best qualified applicant for the position because of his dislike of administrative duties, his apparent disinterest in clinical work, and his tendency to arrive late to meetings."  *Id*. at 184.  The instant case is distinguishable from *Mitchell* because Plaintiff has presented sufficient evidence from which a rational trier of fact could conclude that the Postmaster position which he sought – and qualified for – is objectively more prestigious than a supervisor position.  The precedential import of *Mitchell* is also undermined by the fact that the case was decided prior to *Burlington Northern and Santa Fe Ry. Co. v. White*, – U.S. – , 126 S. Ct. 2405 (2006).  Moreover, the majority's reliance on *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761 (1998), is also inapposite because *Ellerth* is a sexual harassment hostile work environment case and is, therefore,

third parties that a postmaster position is generally more sought after than a supervisor position because of its unique attributes. A postmaster is in charge of his office. This is an objective distinction from a supervisory position in a larger office, in which authority is exercised only over one aspect of operations. Even were the total number of employees supervised by a postmaster the same or fewer than the number supervised by a supervisor in a larger office, the postmaster position may still be sufficiently unique inasmuch as the postmaster is the final authority on site, which is a significant distinguishing factor from merely being a supervisor in a larger office.

Defendant's counterarguments as to level of pay and number of supervised staff do not cancel out Plaintiff's evidence of enhanced prestige. Pay and number of employees supervised are not dispositive with respect to the level of prestige a position holds. Although these factors may be typically indicative of higher-level positions, they are not the only factors determining a position's prestige. Common experience teaches us that independence is a highly desirable employment condition. The objective desirability of being in charge of an entire post office is a sufficient distinguishing factor for a postmaster to make the position more prestigious than the supervisor position already held by Plaintiff. Plaintiff has presented sufficient evidence such that a reasonable jury could infer that Plaintiff has suffered an adverse employment action under the majority's formulation of the test.

Therefore, even under the majority's formulation of the adverse employment action test to be applied in the instant case, I would find that Plaintiff has carried his burden on summary

---

distinguishable from the instant case.

judgment.